COMMONWEALTH vs. LELAND J. MANNING.

Suffolk.   March 5, 1975. — May 7, 1975.

Present: TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Practice, Criminal,* Plea, New Trial.   *Evidence,* Relevancy and
materiality.

Where, during the course of the presentation of the Commonwealth's
case at a trial for first degree murder, the defendant pleaded
guilty to second degree murder but later claimed on a motion for
a new trial that his plea was coerced by reason of the combined
influence of his attorney and his family to the effect that there
would be no turning back for him if the Commonwealth's case
proceeded further and that he should so plead in order to avoid
the death penalty, findings of the hearing judge, that in the cir-
cumstances it was proper for counsel to inform the defendant and
his family of the defendant's precarious position and to advise him
so to plead, and that the defendant's plea was voluntary, he having
had the choice of proceeding with the trial or accepting the advice
of his counsel, were warranted.   [703-706]

A plea of guilty in a criminal case is voluntary if it is the defendant's
own, guided by reasonable advice of his counsel, his own know-
ledge of what he has done, and a fair understanding of the alter-
natives.   [706]

In the circumstances, at the hearing of a motion for a new trial of
a murder case asserting that a plea of guilty to second degree
murder during the trial had been involuntary, there was no er-
ror in striking out evidence admitted de bene that prior to the plea
the defendant's sister had paid money to the defendant's counsel,
court appointed, who advised making the plea, and had told him
that the sum paid was all the defendant's family could afford.
[706-707]

INDICTMENT found and returned in the Superior Court
on July 6, 1966.

A motion for a new trial was heard by *Connolly,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Joan C. Stanley* for the defendant.

*Frances M. Burns,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.    Shortly after midnight on July 5, 1966, Donald G. MacVarish, Jr., was stabbed to death in the courtyard of the Church of Saints Peter and Paul on West Broadway in South Boston.    The following day, Leland J. Manning was indicted by a grand jury for the first degree murder of MacVarish.[1]    On August 1, counsel was appointed by the court to represent the defendant, who pleaded not guilty.    Manning was kept under observation for a period at the Massachusetts Correctional Institution at Bridgewater; he was not, however, found incompetent to stand trial.    Trial commenced January 16, 1967, but on the morning of January 20, while the prosecution was still presenting its case, the defendant sought permission to change his plea to guilty of murder in the second degree.    The judge asked Manning the usual questions: whether he understood fully the nature of the procedure; whether he had had the benefit of counsel; whether the significance of the charges, and the possible penalties, had been explained to him; and whether he pleaded guilty voluntarily and not as the result of any threats or promises.    The defendant made appropriate responses, and the trial judge accepted the plea.    Manning was twenty-two years of age at the time, and had gone as far as the seventh grade in school.    On being sentenced, Manning stated that he was sorry for what had happened, and on further questioning by the judge, he

---

[1] Paul F. Hennessey was also indicted for first degree murder at the same time.    It appeared that he played a lesser role in the affair than Manning (see page 702, *infra*) and he was allowed to plead guilty to manslaughter at the commencement of Manning's trial.    His case is not before us today.

said he felt he had received a fair trial and was satisfied with the way he had been represented by counsel. He received the mandatory sentence of life imprisonment.[2]

More than six years later, on September 21, 1973, Manning filed a motion for a new trial. He alleged that he was put under so much pressure to plead guilty by his attorney and by his family on January 20, 1967, that the plea change should be held coerced.

After a hearing on November 30, 1973, at which Manning, his sister, his mother, and his former attorney testified, and at which the transcript of the prior trial and plea change was introduced, the judge denied the motion. Manning appeals, arguing that the evidence proved the coercion, that it was error for the judge at the hearing to strike as irrelevant certain testimony concerning the payment of $1,000 by his family to his trial counsel, and that it was error to exclude certain other evidence. Having before us the judge's findings, rulings and decision, as well as the transcripts of the hearing on the motion and of the original trial, we find the judge's decision to be correct, and hence affirm his denial of a new trial.

The transcript of the original trial to the point at which Manning changed his plea reveals that the victim MacVarish, aged seventeen, and a female companion, Marion Benson, were sitting on the front steps of the church at about midnight, sharing a cigarette while on their way to the Broadway M. B. T. A. station from Columbia Stadium, where they had watched a fireworks exhibition. MacVarish was wearing shorts. Manning approached the couple and asked for a match; it appears from the testimony that the parties did not know each

---

[2] Manning had also been indicted, and was being tried, for assault and battery with a dangerous weapon, and he simultaneously changed his plea as to that offense to guilty. He was given a sentence of from seven to ten years on that offense, to be served concurrently with the life sentence for murder.

other. MacVarish said that he had a match, and rose to search his pockets for one. After a short period during which Manning said, "I thought you said you had a match," and MacVarish replied, "I'm looking for one," Manning slapped MacVarish in the face. Miss Benson, the source of the testimony to this point, thereupon fled around the corner of the church. Her further testimony was only that she heard noises and voices.[3]

There was additional testimony, however, by one Anne Shyp, who was awakened by the noise from her sleep in a second floor apartment that overlooked the scene. She said she saw three boys, one, in shorts, being held down on the church steps by the two others. The one in shorts, MacVarish, managed to get up, knock down the smaller one (Paul Hennessey, who had apparently joined Manning), and throw the "stockier" one (Manning) over his back and into the street. All returned to the sidewalk, and there was some conversation Mrs. Shyp could not hear. Manning threw a punch at MacVarish and missed, whereupon MacVarish punched Manning, knocking him down again. MacVarish then left, climbing a low wall to the church courtyard and walking across it to the rear. Manning went after him, also walking, while Hennessey stayed somewhat behind. At the rear of the courtyard Manning jumped on MacVarish and there was a tussle. The next thing Mrs. Shyp knew, MacVarish was lying on the ground, and Manning was leaving the yard. A car came along, and Hennessey and Manning got into it and rode away; before he got into the car, Manning yelled, "He's dead now," and Mrs. Shyp could see a shiny object in Manning's hand. Although the time of the incident was about midnight, the area was well lit, and Mrs. Shyp could not be shaken

---

[3] She identified Manning as the man who came up to them upon being shown photographs by the police on July 5, and also when she saw him at a police station the same day.

in her testimony as to what she saw despite lengthy cross-examination.

The next, and last, witness called before Manning changed his plea was Dr. Nathan Brenner, a police physician who reported on his physical examination of Manning in the early morning of July 5; he found an abrasion on the back of Manning's neck, consistent with his being thrown into the street as Mrs. Shyp had described. There were other minor injuries, but no serious facial injury, no injury to the head, and no other observable symptoms or injuries, and Manning made no complaint of any. Also introduced in evidence was Mac-Varish's death certificate, indicating that death was caused by a stab wound penetrating the heart. Lawrence Berry, who according to the prosecutor's opening statement had also seen the fight, had not yet testified, nor had Hennessey or the medical examiner.

It is in the context of the trial situation as it stood at this point that the testimony on the motion for a new trial must be viewed. Manning's counsel had been putting up a defense which the judge at the hearing characterized as "vigorous and intelligent," but had been unable to shake the testimony of the prosecution witnesses, and he knew that more damaging evidence was to come; as the hearing judge concluded, "the evidence . . . was convincing and might well have produced a verdict of guilty in the first degree." Manning's sister testified at the hearing on the motion that on the morning of the twentieth "[h]e [counsel] told us that the medical examiner would be coming on next and that once he got on the stand . . . there would be no turning back for Lee and if we could speak to Lee and ask him to put in a plea of guilty"; she said she repeated that to Manning and told him she thought it was "about the only thing he could do." She also said that she had herself heard all the testimony, and "[m]ore or less"

formed her own opinion as to how the case was going.[4]
Manning's mother testified similarly; she said that counsel
on the twentieth told her that Manning would most likely
be found guilty, and that they should try to talk to him
because "there was so many wounds." Manning testified
that he had been drinking for a couple of days, and had
told his counsel that he didn't know if he had committed
the murder or not. He said there had been talk of a
change of plea before the trial, and a couple of times
earlier during the trial, both with his counsel and with
his family, but that on the twentieth counsel had told
him of several possible witnesses and warned him that he
could receive the death penalty, and that his family also
asked him to plead guilty; on the twentieth "[t]hey were
asking me to plead guilty more than what they had
been," and he figured he was "doomed" or "would never
see daylight again" if he didn't plead guilty. But he
admitted that in making his decision he had taken into
account the testimony already given and the testimony to
come, and that he himself had made the choice of
pleading guilty; his counsel had not forced him to do so.[5]

---

[4] Manning's attorney attempted to ask her if Manning had told her
whether he was guilty or innocent, and what he had told her about
the crime. This was excluded as calling for hearsay, and the attorney
offered no other ground for its admission, though an answer might
have helped to indicate the sister's frame of mind when trial counsel
spoke to her on the twentieth concerning the case. A question about
what the sister had concluded about her brother's guilt or innocence
was excluded as irrelevant. This, too, could have shed light on her
frame of mind on the twentieth. But we believe the error, if any, to
be of no consequence, considering the totality of the evidence in the
record, the remoteness of this issue from the central issue of the
voluntariness of Manning's plea, and the testimony of the sister that
she "[m]ore or less" formed her own opinion of the progress of the
case.

[5] Manning assigns as error the exclusion of a question put to him on
redirect examination: "[D]id you feel you had any choice to make?"
This question, which was excluded as argumentative, followed
immediately upon testimony by Manning under cross-examination
that he thought he had to make the choice, and that he felt he

Manning's trial counsel was called by the Commonwealth and testified that a major setback had been his failure to get from the physician who examined Manning on July 5 any testimony that Manning had been drinking. Counsel said that he felt that he had an "obligation . . . to advise . . . [the defendant of the] possibilities of a first degree," and that he told him that the evidence was strongly against him and that he might get the death penalty, but he said that he left it to Manning to make his own decision; he denied telling the mother and sister to tell Manning to plead guilty, though he admitted discussing the case with them. He said that in his own opinion a guilty plea was clearly in Manning's best interests.

Upon all the testimony, the hearing judge found that "[u]nder the circumstances in this case it was proper, and the duty of counsel, to inform the defendant and his family of the precarious position the defendant was in and to advise him . . . to plead guilty to murder in the second degree. The defendant had the choice of proceeding with the trial or accepting the advice of his counsel. . .. His choice . . . to change his plea to guilty of murder in the second degree . . . was voluntary."

The plea attacked in this case as having been involuntary was made before the decision in *Boykin* v. *Alabama*, 395 U. S. 238 (June 2, 1969); the burden of proof was therefore on Manning to show the coercion. See *Commonwealth* v. *Leate*, *ante*, 689, 693-694 (1975), and cases cited. As we had occasion to repeat in the *Leate* case, a defendant who pleads guilty will be doing so under an assortment of pressures inherent in the situation; that such pressures, including fear of harsher consequences

"would be doomed" if he did not plead guilty. Accordingly, we see no error. Moreover, with this, as with the matters discussed in note 4, we believe that a reading of the entire record indicates that no prejudice resulted.

should he elect to stand trial, contribute to the decision to plead does not alone make the act a coerced one. It must be considered as voluntary for the present purpose if it is the defendant's own, guided by reasonable advice of his counsel, his own knowledge of what he has done, and a fair understanding of the alternatives. In this light we find no cause to doubt that the judge's conclusion of voluntariness was correct. It does not argue against the conclusion that the pressure on Manning to make his decision had quite naturally increased as the trial proceeded and the prosecution's case gained strength, and that by the morning of the twentieth a point of no return had nearly been reached.

We consider, lastly, Manning's objection to the striking of certain testimony concerning the payment of $1,000 by his family to his court-appointed trial counsel. Manning's sister testified that she had paid $500 to counsel's secretary on the second day of trial, at counsel's request, and that she gave counsel himself a second $500 on the morning of the twentieth. She said she had previously told him that $1,000 was all they could afford. It was later that morning, she said, that counsel told them to try to get Manning to plead guilty; thereafter the final conversations and decision to plead guilty occurred. The sister's testimony was intended to suggest that the advice to plead guilty was actuated, not by trial counsel's disinterested appraisal of Manning's best interests, but by the fact that he had got the last dollar out of the case and wanted to end it promptly. Furthermore, on its face the receipt of the money would be a violation of Superior Court Rule 95 (1954), as amended,[6] governing court-appointed counsel, and highly unprofessional.

---

[6] The Rule requires that anyone appointed as counsel in a first degree murder case file an affidavit stating, inter alia, that he will not accept any compensation for his services "from any source other than that which may be allowed by the court." Manning's counsel had filed the required affidavit. There have been amendments to Rule 95 since 1966 irrelevant to the present purpose.

Trial counsel testified that he did not recall the circumstances in which the event took place seven years earlier, but there is some indication that it resulted from a misunderstanding of the court rule and that counsel felt he was properly entitled to the money paid. This was not pursued further on the motion. Counsel said that when, a year or two before his current testimony, he had received a letter from the defendant complaining about the payment, he suggested an appearance before the Chief Justice of the Superior Court, and after that appearance, he volunteered to, and did, return the money.

The sister's testimony was admitted by the judge de bene, subject to a later motion by the Commonwealth to strike. In finally granting the motion to strike, the judge could well have gone on the ground that the testimony, such as it was, did not diminish to any material degree the force of the other evidence showing continual discussion before the twentieth of the advisibility of the plea, the vigorous defense put up by counsel throughout, and the solid justification for counsel's advice to the defendant in the predicament of trial as it appeared at that time. The evidence offered on the matter, in short, was not sufficient to put in question the judge's conclusion on the precise issue of the voluntariness of the plea.

*Order affirmed.*