COMMONWEALTH *vs.* EDWARD F. LEATE & another.[1]

Plymouth. March 3, 1975. — May 7, 1975.

Present. TAURO, C.J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Practice, Criminal*, Plea, New trial, Disqualification of Judge. *Constitutional Law*, Due process of law. *Judge.*

The record in criminal cases supported findings by the judge on motions for a new trial that the defendants had pleaded guilty "intelligently and voluntarily." [692-693]

Upon motions for a new trial of criminal cases, the defendants had the burden of showing that pleas of guilty made before the decision in *Boykin* v. *Alabama*, 395 U. S. 238 (1969), had not been made intelligently and voluntarily. [693-694]

Evaluation of the credibility of the witnesses testifying on a motion for a new trial of criminal cases is for the judge hearing the motion. [694]

The Constitution of the United States does not require that a plea of guilty by the defendant in a criminal case be "freely" made in the sense of being uncompelled by fear of dire consequences if he should stand trial, nor does that Constitution require that the plea be shown by hindsight to have been the necessarily correct choice. [694-696]

---

[1] Christopher J. Pina.

A judge who had accepted pleas of guilty in criminal cases was not thereby required to disqualify himself from hearing a motion for a new trial asserting that the pleas had not been made intelligently and voluntarily. [697-698]

INDICTMENTS found and returned in the Superior Court on January 12, 1968.

The cases were heard by *Macaulay*, J., on motions for new trials.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Paul J. Burns* for the defendant Pina.

*Vincent A. Harrington* for the defendant Leate.

*Helen Murphy Doona*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. We are required to consider whether guilty pleas entered by the defendants Edward F. Leate and Christopher J. Pina some seven years ago should, on postconviction attack, be upheld as voluntary, as the judge below held, or set aside as involuntary because not intelligently and understandingly made. There is an additional question, whether it was proper for the judge who accepted the guilty pleas to hear and pass on the later motions to set them aside.

Leate and Pina were indicted for the murder in the first degree on November 25, 1967, of one Joseph J. Sheerin and for other lesser crimes arising from the same alleged criminal episode.[2] They initially pleaded not guilty to all the charges.

On May 27, 1968, the defendants both changed their pleas, pleading guilty to second degree murder and to the other charges. At the time, they had been held in jail for about six months but their trials had not commenced. They had each been represented by counsel at least from January, 1968, and these counsel were present in court at

---

[2] The other crimes for which they were indicted were kidnapping, robbery with force and violence, and burning an automobile.

the hearing when the pleas were taken. The hearing took the usual form. The men were asked individually whether they fully understood the nature of the crimes with which they were charged, whether they appreciated what they were doing in pleading guilty to second degree murder, whether they understood that they were subject to the full and maximum punishment for that crime, and whether they were pleading guilty only because they were in fact guilty. Both men gave satisfactory answers. In addition, Leate was asked by his own attorney whether he, the attorney, had explained to him the consequences of the plea, and he answered that he had.

There was testimony also by James E. O'Connor, the chief of police of Scituate, as to his investigation of the alleged crime. On November 25, 1967, the burned car of Joseph Sheerin was found on a roadside in Hanover; two days later his body was found in Norwell. The medical examiner reported that he had been beaten to death. On the day the body was found, Christopher Pina got in touch with the police, who visited him at his parent's home. Miranda warnings were given, and Pina indicated he wanted to talk to the police because he couldn't live with what had happened. His story, as given to the police, was that on November 24 he and Leate jumped Sheerin after he left a bar in Scituate, beat him, and took his billfold. They then left him, but, after finding no money in the billfold, they returned, beat the victim some more, and put him into his own car. They then drove the car to a secluded spot and dumped Sheerin out; he was still moaning when they left him. While still in the car, they had gone through his pockets and found $3.50 or $3.75. After the body was dumped, Pina drove the car to the site where it was later found, and set fire to it.

At the conclusion of the hearing just summarized, the judge accepted the pleas and the men were sentenced to life imprisonment for murder with concurrent terms for the lesser offenses.

In July, 1970, the defendants filed motions to retract their guilty pleas, to have their sentences vacated, and to be granted new trials.[3] When their motions came on to be heard on March 30, 1971, with the judge who had originally accepted the pleas presiding, the defendants asked the judge to recuse himself, which he refused to do. The defendants then testified, as did their original attorneys,[4] who were called by the Commonwealth.

The defendants both testified that they had spoken with their respective counsel several times before changing their pleas. Pina testified to his lack of education: he had been in special classes after first grade, and had not learned to read or write, though he had been in school until the age of fifteen. He said he had not understood fully what he was doing when he pleaded guilty. His main concern, he said, was to avoid the electric chair which his attorney told him would be his fate if he went to trial. He claimed he had not known the sentences to which he was exposing himself by his pleas, and had been told by his attorney that he would get only about five years. He said he did not remember what the judge had asked him at the original hearing.

Leate's testimony was directed to three points. He said his attorney told him that Pina was going to plead guilty and in the event of trial would testify against him; that if he pleaded guilty he would escape electrocution, and, further, that his brother, who had been charged with being an accessory after the fact to unarmed robbery in the same episode, would be given a suspended sentence. He acknowledged that there was never any talk with the prosecutor about the treatment of his brother (who in fact did receive a suspended sentence); that when he

---

[3] Pina also filed a fresh motion for a new trial on March 29, 1971, which was heard with the other motions.

[4] The defendants were each represented by new counsel at this post-conviction hearing. It has not been claimed, however, that there was any inadequacy of counsel at the 1968 hearing.

pleaded guilty he knew what he was doing; and that his attorney had asked him explicitly at the hearing whether the consequences of the plea had been explained to him and he had answered yes. Leate also testified to his lack of education; he had left school at the age of fifteen on finishing the sixth grade.

Testimony by the attorneys who had represented Leate and Pina in 1968 covered their substantial experience in handling murder cases, their visits to their clients on several occasions, and the fact that they had discussed these plea changes with their clients. Both defendants, however, asserted the attorney-client privilege to prevent their attorneys from testifying to the substance of their discussions prior to the changes of plea, and the judge allowed the privilege.[5]

On all the evidence, including the transcript of the 1968 hearing, the judge concluded that "in each case the defendant intelligently and voluntarily pleaded guilty on May 27, 1968, to the offences charged." Reviewing the judge's report of material facts, rulings, and orders as well as the transcripts of the two hearings, we find no basis for disagreeing with the judge's conclusion.

The pleas here challenged as involuntary were made before the decision of *Boykin* v. *Alabama*, 395 U. S. 238 (June 2, 1969). The *Boykin* rule is not retroactive. *Andrews* v. *Commonwealth*, 361 Mass. 722, 726 (1972). *McClellan* v. *Commonwealth*, 362 Mass. 878 (1972). *Huot* v. *Commonwealth*, 363 Mass. 91, 100, 101 (1973). *Dominguez* v. *Henderson*, 447 F. 2d 207 (5th Cir. 1971). *Brown* v. *Swenson*, 487 F. 2d 1236, 1240 (8th Cir. 1973), cert. den. 416 U. S. 944 (1974). The burden to

---

[5] While it is not an issue here, we observe that by their own testimony on the content of their conversations with their attorneys, the defendants may well have waived the privilege which they asserted. See *Commonwealth* v. *Bernier*, 359 Mass. 13, 15, n. 3 (1971); *Knowlton* v. *Fourth-Atl. Natl. Bank*, 264 Mass. 181, 196 (1928); McCormick, Evidence, § 93 (2d ed. 1972); Wigmore, Evidence, § 2328 (McNaughton rev. 1961).

show involuntariness thus remains on the defendants. See *Huot* v. *Commonwealth, supra,* at 100: *Commonwealth* v. *Kozerski,* 1 Mass. App. Ct. 106, 110 (1973), S. C. 364 Mass. 833 (1974). It will stand repetition, too, that evaluations of the credibility of witnesses are for the judge who heard them, a proposition of some importance here since the only evidence tending to show involuntariness came from the defendants themselves. See *Commonwealth* v. *Bernier,* 359 Mass. 13, 16 (1971); *McClellan* v. *Commonwealth, supra; Commonwealth* v. *Kozerski, supra.*

A defendant typically pleads guilty under an assortment of pressures inherent in the situation that confronts him. Generally, he will be seeking to avoid putative harsher consequences, and there will be difficult probabilities to assess for which he will be forced to rely substantially on counsel. In addition he will be conjuring with his own knowledge of what he did. The United States Constitution cannot require that a defendant's plea, in order to stand, must have been made "freely" in the sense of being uncompelled by fear of dire consequence if he should stand trial. See *Brady* v. *United States,* 397 U. S. 742, 749-752 (1970); *North Carolina* v. *Alford,* 400 U. S. 25, 31 (1970); *Commonwealth* v. *Morrow,* 363 Mass. 601, 606 (1973). Nor can it require that the plea be shown by hindsight to have been the necessarily "correct" choice. See *Brady* v. *United States, supra,* at 756-757; *Commonwealth* v. *Morrow, supra,* at 606-607. What the Constitution does require is that, under the inevitable pressures and uncertainties, the defendant, guided by his counsel, shall have a fair understanding of the alternatives in the degree his intelligence permits, and make a choice in that light. See *Brady* v. *United States, supra,* at 754-756; *North Carolina* v. *Alford, supra,* at 31.

Leate's claim to be relieved of his plea is quite weak. Any belief on his part that by pleading guilty he would help his brother rested, as he knew, on his attorney's

judgment, for there had been no transaction on the matter with the prosecution. So far as appears, his fear that Pina might testify against him was a realistic factor to be weighed, as was his fear (in 1968) that he might suffer the death penalty if tried and found guilty. Despite the fact that he had only a sixth grade education, Leate himself testified that he understood what he was doing when he resigned himself to be sentenced. We cannot cavil with the judge's conclusion that Leate "did have the capacity to understand and appreciate the wrongfulness of . . . [his] conduct . . . and . . . to know that . . . [his guilty plea] would result . . . in life imprisonment," and that he "intelligently and voluntarily pleaded guilty on May 27, 1968."

As to Pina, though he answered "yes" to the judge's question whether "you understand by pleading guilty you are subjected to full and maximum punishment for second-degree murder," there was nothing comparable to Leate's explicit testimony that his attorney had explained to him the consequences of the plea. If Pina is believed, he did not know the possible sentences and thought he would be out of jail in about five years. In *Wade* v. *Wainright*, 420 F. 2d 898 (5th Cir. 1969), and *United States ex rel. Leeson* v. *Damon*, 496 F. 2d 718 (2d Cir. 1974), cert. den. 419 U. S. 954 (1974), guilty pleas made in State courts were set aside as involuntary on the ground that the defendant did not know the maximum possible sentence. But in the *Leeson* case, the defendant's attorney himself supported by affidavit the defendant's contention that he had not been informed about the maximum sentence, and the judge found accordingly; and in the *Wade* case the judge made a like express finding. If those cases be correct, they would not govern here, for the only pertinent evidence came from Pina himself; the judge was entitled to, and apparently did disbelieve him, finding that "[t]he differences between the testimony . . . [given] in the March, 1971, hearings compared with that given . . . in the May, 1968,

hearings were many," and that "[t]he transcript record of the May 27, 1968, hearings . . . shows that . . . [he] then said that . . . [he] did then understand." It may be noted here that Pina himself objected to and secured the exclusion of testimony by his attorney as to what conversation there had been between them before he pleaded. Pina, however, was less intelligent than Leate, and less educated, and we have the question whether, even if properly informed of all the relevant facts, he was of sufficient understanding to make a knowing plea. There was some questioning of Pina at the 1971 hearing on his understanding of certain words — "promise," "maximum," "induce," "appreciate" — and the answers were not altogether reassuring. But as to the inferences to be drawn from these responses, scope must be given to the judge's observation and discernment, and this holds also as to a judgment regarding Pina's general competence; it is to be noted that no testimony was offered by teachers or psychiatrists concerning Pina's level of intelligence. The judge found on all the evidence, and in the same terms quoted above as to Leate, that Pina had the necessary "capacity to understand." We have in the past suggested that the test of competence to plead is similar to that for standing trial, see *Commonwealth* v. *Morrow*, 363 Mass. 601, 607 (1973), for defendants at trial face decisions as difficult and complex as those involved in deciding whether to plead guilty, and advice of counsel serves like purposes in both situations and is as much needed in the one as in the other. To lay down more exacting requirements in respect to accepting a defendant's plea than in permitting a defendant to stand trial might indeed visit odd and harsh consequences upon him by forcing him to unreasonable risks of going to trial and receiving sterner punishment in the end. See also *Wolf* v. *United States*, 430 F. 2d 443 (10th Cir. 1970); *Malinauskas* v. *United States*, 505 F. 2d 649 (5th Cir. 1974).

To pass to the second point at bar, the judge was not required to withdraw from the postconviction hearing simply because it was he who had accepted the pleas. In *Earl* v. *Commonwealth,* 356 Mass. 181, 183 (1969), we said, in holding that a motion for a new trial was to be preferred to a writ of error to try the question of alleged unconstitutional misbehavior by the prosecution, that "it is preferable that these questions be resolved in the first instance by the trial judge . . .. The effect of this practice will be to place in the hands of the trial judge, rather than . . . the single justice, the task of resolving factual disputes underlying alleged constitutional errors." The *Earl* case did not involve a claim that the judge had himself previously made an incorrect ruling, but in *Commonwealth* v. *Penrose,* 363 Mass. 677 (1973), we went further and held that the logic of the *Earl* case extended to having the original trial judge pass on a motion for a new trial challenging his acceptance of a guilty plea.[6]

The defendants make much of *Halliday* v. *United States,* 380 F. 2d 270 (1st Cir. 1967), in which the Court of Appeals required that a hearing on the voluntariness of a guilty plea be held before a district judge other than the one who had accepted it. This was explained as preferred procedure rather than as a constitutional requirement, and the procedure is not followed by other Federal Courts of Appeals which have permitted the original trial judges to sit on these motions. See *United States* v. *Smith,* 337 F. 2d 49, 51-53 (4th Cir. 1964), cert. den. 381 U. S. 916 (1965); *Briscoe* v. *United States,*

---

[6] Also of note is *Commonwealth* v. *Leventhal,* 364 Mass. 718, 722 (1974), where we held it was proper for the trial judge to pass on a motion for a new trial even when the ground alleged was bias on his part at the original trial. We wrote that "[w]e assume that a judge . . . called upon to reexamine an issue should keep his mind 'open to the truth and susceptible to every right influence flowing from the evidence.' *Dittemore* v. *Dickey,* 249 Mass. 95, 100 (1924)."

391 F. 2d 984, 988-989 (D. C. Cir. 1968) (per curiam); *King* v. *United States,* 402 F. 2d 58 (9th Cir. 1968); *Lucero* v. *United States,* 425 F. 2d 172 (10th Cir. 1970).[7] We adhere to our practice in the matter.[8]

*Orders affirmed.*

[7] American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Post-Conviction Remedies, § 1.4 (c) (Approved Draft 1968), states that "neither a general rule favoring nor one disfavoring submission of post-conviction applications to the . . . trial judge . . . is clearly preferable," and the commentary notes that "[t]he current practice, to the extent that it is known, seems to favor the assignment of applications for post-conviction relief to the same judge who presided at the original trial."

[8] We do not mean to suggest that a judge should not withdraw where special circumstances appear calling into question the judge's impartiality. See S.J.C. Rule 3:25, Canon 3C (1), 359 Mass. 844 (1972).