COMMONWEALTH *vs.* FRANCIS T. BOLDUC.

Suffolk. September 13, 1977. — June 28, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Constitutional Law*, Assistance of counsel, Waiver of constitutional rights. *Practice, Criminal*, Assistance of counsel, Plea.

The record in a criminal case supported findings by the judge on a motion for a new trial that the defendant's pleas of guilty were not the result of coercion, that the defendant understood the consequences of his pleas, and that the defendant knew the nature of the charges against him when he pleaded. [536-539]

A claim of ineffective assistance of counsel for the defendant in a criminal case failed where the defendant made no showing that he lost any defense as a result of the alleged inadequacy of counsel. [539-540]

A defendant was not denied effective assistance of counsel at the time he pleaded guilty to several indictments by the fact that his counsel also represented two codefendants where there was no showing that at the time the pleas were entered the interests of the defendant and the codefendants were in conflict. [540-542]

A defendant was denied effective assistance of counsel at the time he was sentenced after pleading guilty by the fact that his counsel also represented two codefendants who pleaded guilty where it was in the interest of the codefendants to argue at the disposition hearing that the defendant was the person primarily responsible for the crimes with which they were all charged. [542-543]

INDICTMENTS found and returned in the Superior Court on August 2, 1960.

A motion to vacate sentences and withdraw pleas of guilty was heard by *Dwyer*, J.

After review by the Appeals Court the Supreme Judicial Court granted leave to obtain further appellate review.

*Daniel C. Mullane*, Assistant District Attorney, for the Commonwealth.

*P. J. Piscitelli* for the defendant.

QUIRICO, J. This is an appeal from the denial of a motion for a new trial, by which the defendant seeks to vacate the guilty pleas he entered in 1960 to thirty-four indictments for armed robbery and related crimes. The defendant contends that the pleas were made involuntarily and that he was denied his right to the effective assistance of counsel.

The findings of the judge who heard the motion for a new trial (motion judge) are summarized. On July 13, 1960, the defendant Francis T. Bolduc and two codefendants were arrested. The defendant at the time was an escapee from the Massachusetts Correctional Institution at Walpole where he had been serving a life sentence for murder in the second degree. After their arrest, the three men voluntarily admitted their participation in a series of armed robberies. Six episodes were involved, Bolduc having participated in all of them, one by himself, while each of the codefendants participated in three. Indictments were returned against them on August 2, 1960. Bolduc was charged in nineteen in-

dictments with armed robbery, in four with confining or putting in fear, in two with assault and battery with a dangerous weapon, in one with breaking and entering in the nighttime, in five with possession of firearms, in one with assault with intent to murder, and in three with conspiracy.[1] Bolduc was arraigned on one charge on September 7, 1960, and pleaded not guilty. He was then removed from the Charles Street jail, where he had been incarcerated since his arrest, and returned to Massachusetts Correctional Institution at Walpole.

We conclude that the defendant's pleas of guilty must stand, but that the sentences imposed in consequence thereof are to be vacated and the cases remanded to the Superior Court for new sentencing.

Counsel for Bolduc was appointed on September 27, 1960. He was also appointed to represent the codefendants. During the next three weeks counsel prepared the case by interviewing the codefendants several times, and by obtaining as much information as possible from the police. He did not talk with Bolduc during this period.

A hearing was held before a judge of the Superior Court on October 18, 1960. The indictments were not read to the three defendants, nor does it appear that their reading was waived. Each of the two codefendants pleaded guilty to all charges. Bolduc pleaded not guilty. A recess was then requested by counsel. He gave as a reason that "[h]e [Bolduc] doesn't even know what . . . [the indictments] are."

Bolduc, his codefendants, and counsel were removed from the court room to a detention cell. Several of the indictments were mentioned to the defendant by counsel. The bulk of the discussion, however, appears to have been concerned with the wisdom of Bolduc's not guilty pleas. Counsel stressed to Bolduc that his pleas of not guilty would not benefit him, since he was already serving a life sentence,

---

[1] One of the armed robberies involved thirteen victims, thus giving rise to the multiple indictments.

A lesser number of indictments were issued against each codefendant. None of these is involved in the present appeal.

.

but that it might reduce the possibility that his codefendants
would receive favorable sentences. Bolduc conferred with
the codefendants and concluded that, if it would help them,
he would plead guilty. The entire conference lasted approx-
imately twenty minutes. On his return to the court room the
defendant pleaded guilty to all the indictments against him
except one — that charging assault with intent to murder.

The guilty pleas were followed by the testimony of two
police officers describing the crimes. Counsel then delivered
a disposition argument for his clients. He asked for mercy
for all three of his clients. He stated, however, that Bolduc's
position was probably hopeless since he was already serving
a life sentence. He therefore concentrated on the plight of
the codefendants, arguing that Bolduc was the instigator of
the criminal activity, and that they, the codefendants, had
participated only because they felt honor-bound to help an
escapee who had no one else to look to for aid.[2] He repeated

---

[2] Defense counsel's argument on disposition, delivered on October 18,
1960, was, in part, as follows: "Bolduc, would you stand up, please? I
want Your Honor to take a good look at this young lad. He's 22 years old,
and I want to say to the Court that in my experience, I don't think I've
ever been stumped or been at a loss for words, been in a position where I
had to address the Court in behalf of a defendant and really didn't know
what to say. Here is a man who is totally and absolutely without any hope
of any kind, a man who must go through the rest of his natural life with
the sentences that have already been imposed upon him for various
crimes, at Walpole, in a section of that prison known as Block 10. . . ."

"Now, then, I submit in my humble opinion that with the passing of
some years, the best that can happen to this young man in our penal
system, if he is kept within the confines of that particular section, is that
he will become a violent maniac. However, there is nothing this particu-
lar Court can do about it. To talk to Your Honor about sentencing in his
particular case would be a waste of my time and an imposition upon the
credibility of the Court. I can't tell you what type of sentence to impose; I
can't tell you what type of sentence to impose if I were sitting on the
bench. I merely request the Court to give this sentence your utmost con-
sideration. . . . I leave that in Your Honor's lap, with whatever hope for
mercy there is, whatever that is, that is entirely for Your Honor's consider-
ation. Twenty-two years of age."

"I now turn to O'Keefe. I've talked with O'Keefe. He has quite a
record. He had just been out a short time when Mr. Bolduc escaped, and
Your Honor, what is the natural thing but for a man who escapes from an
institution to look for? The natural thing for him is to look for some of the

the theme of this argument prior to sentencing on November 14, 1960, when he asked the judge not to deal more harshly with the codefendants because of their association with Bolduc than he otherwise would.[3] Bolduc was

---

companions, look for some of the companions with whom he did time. No other type of individual will offer him any haven. No other type of individual will associate with him. And in the natural course of events, they get together."

"When they get together, they run as a common herd. When they run as a common herd, naturally, they need some sort of currency or money, to exist, and naturally their existence is more hazardous than the ordinary person, so they can't go out on the highways and byways and docks and stores and other places and buy what they need. They can't work for what they need, and of necessity they must turn to some sort of crime in order to gain the money with which to buy what they think are the necessities. And there you have the beginning of what caused this minor crime wave."

"That's exactly what happened here. Bolduc got out. When he fled, he fled in a direction where he thought maybe some of his inmate friends were, and he bumped into one of them, O'Keefe. Of course, they had no money. O'Keefe had just been released from prison himself. He associated himself with O'Keefe. Bolduc necessarily was a man who had nothing to lose. He had his freedom for whatever time it might be. He sought merely to gain what he could from it, and as a result of it, both of these other members were inveigled into this position."

With reference to Maslauskas, counsel stated: "A very foolish person, and the victim of a very unfortunate situation. . . . He's always had a knack of getting in with the wrong people and being very foolish about things. . . . It was just one of those noble gestures on the part of some criminals, that they exhibit to one whose cause they know is hopeless, that because of the strict code and the fact that they think that they are honorbound to do what they can to help him, they went ahead and did those things. I'm speaking now of both Maslauskas and O'Keefe. They couldn't help themselves. They were bound to give Bolduc whatever defense they possibly could; and in doing so, these crimes were committed, for which they must pay a price."

[3] Counsel's November 14, 1960, argument was as follows: "I'm going to address this honorable Court with the thought in mind that this is not a claim of abandonment as far as Bolduc is concerned. I realize what Your Honor is up against in sentencing a man in this type of case, but the thing that bothers me tremendously about this case — tremendously — is the thought that the association of the other two defendants with this man is such that it may tend to have Your Honor inflict a sentence greater than you ordinarily would if they were not associated with this man at the particular time of the commission of these crimes. This bothers me tremendously."

THE JUDGE: "Associated with which man?"

sentenced to the maximum terms of life imprisonment on the armed robbery counts, with lesser sentences on the other charges.[4] The life sentences given to Bolduc were not to begin running until after the expiration of the life sentence that he was serving before his escape.

Bolduc requested a review of his sentences in an appeal to the Appellate Division of the Superior Court under G. L. c. 278, § 28B. The appeal was dismissed and it does not appear that any further appeal was taken at that time.[5] In 1973 Bolduc, through his present appellate counsel, petitioned this court for an order vacating his guilty pleas. A single justice transferred the matter to the Superior Court for treatment as a motion for a new trial. After a series of hearings the judge denied the motion. On review, the Appeals Court overturned the motion judge's rulings and held

COUNSEL FOR THE DEFENDANTS: "This is Maslauskas and O'Keefe — because they are found in the company of this escapee from Walpole. I realize that they are just as guilty of the crimes as the man with whom they are, but again I want to call just one thing to Your Honor's attention. This I have said before, and I say it again: I am troubled by the case, in spite of the fact that I am a court-appointed counsel. This is a fact, that when a man escapes from an institution where he is serving penal servitude, he has nobody to turn to but men who have done time with him before. These men did. He came to them. Naturally, as an ordinary citizen they wouldn't have helped him. He certainly wouldn't have come to you or me or anybody else; but under the code which these people live under, and the manner in which they live, it is imperative and compulsory that they shield him, protect him, feed him and help him. And I say that is the only thing I ask Your Honor to take into consideration — the plight of these other two men, who unfortunately are convicted criminals, one of them doing time at the present time, and the other about to do time.

"Please, Your Honor, give that thought a great deal of consideration."

[4] The defendant was sentenced to concurrent life sentences on the armed robbery and confining or putting in fear indictments, and concurrent four to five, eight to ten, and three to five-year terms on the other indictments. The assault with intent to murder indictment and the three conspiracy indictments were placed on file.

[5] In 1968 the defendant petitioned, inter alia, for a declaration that the 1960 life sentences were null and void because of an error in the mittimus. The mittimus was corrected and the relief as to the sentences was denied. *Bolduc* v. *Commissioner of Correction*, 355 Mass. 765, 766-767 (1969).

that Bolduc's pleas were "unknowing and involuntary in a constitutional sense."[6] *Commonwealth* v. *Bolduc*, 5 Mass. App. Ct. 115, 126 (1977). We granted an application for further appellate review. G. L. c. 211A, § 11.

1. *Voluntariness of pleas.* The defendant first challenges his guilty pleas on the ground that they were made involuntarily, specifically that his counsel had coerced him into making the pleas, and that he had made them without understanding the consequences or the nature of the charges against him. Because the pleas were entered prior to the case of *Boykin* v. *Alabama*, 395 U.S. 238 (1969), the burden is on the defendant to show the claimed involuntariness. *Commonwealth* v. *Balliro*, 370 Mass. 585, 588 n.5 (1976). *Commonwealth* v. *Leate*, 367 Mass. 689, 693-694 (1975).

The coercion alleged by the defendant was by his counsel's statement that a guilty plea by him might increase the likelihood of favorable sentences for the codefendants. Facing a decision whether or not to plead guilty while weighing such a consideration certainly places some pressure on a defendant. There is nothing in this record, however, sufficient to rebut the finding of the motion judge that "the pressures inherent in the situation which faced this defendant [did not] rise to the level of constitutional infirmity." Any defendant who pleads guilty does so under the weight of an assortment of pressures that are intrinsic to such a situation. *Leate, supra* at 694. *Commonwealth* v. *Manning*, 367 Mass. 699, 705-706 (1975). The recognition of these pressures on the defendant is not enough, however, to render the plea involuntary in a constitutional sense. See *Manning, supra*. So long as the plea "is the defendant's own, guided by reasonable advice of his counsel, his own

---

[6] The Appeals Court did not, however, order the relief requested by the defendant. Instead, it remanded the case to the Superior Court for a determination of whether the defendant had waived his right to bring this action because of the thirteen-year delay. On granting further appellate review, this court issued a remand order for the same purpose. The motion judge, after reviewing the record and hearing arguments, found that the defendant had not waived his right to proceed.

knowledge of what he has done, and a fair understanding of the alternatives," it must be considered voluntary. *Id.* at 706.

According to the findings of the motion judge, counsel, in conferring with the defendant just prior to the latter's guilty pleas, "stressed the fact that since defendant was serving a life sentence, he had nothing to lose by pleading guilty and hence all his refusal would serve to accomplish was to diminish the possibility that his two co-defendants would receive lighter sentences." Counsel testified at the motion hearing, however, that this statement was made in the context of his describing to the defendant all the alternatives that were available to him. Counsel said that he did not recommend any particular course of action to the defendant, and that the defendant's decision to plead guilty was his own.[7] No plea bargaining agreement conditioned on a guilty plea by the defendant had been entered into between the prosecutor and defense counsel. On these facts the degree of inducement to plead guilty is even less than that which we held in *Commonwealth* v. *Balliro*, 370 Mass. 585, 585-590 (1976), was not coercive. There the prosecutor and defense counsel had entered into an agreement whereby the defendant's guilty plea was exchanged for a favorable recommendation on sentencing for the codefendants. We therefore hold that there was no error in the ruling of the motion judge that the defendant's pleas were "not the result of coercion."

Also relied on by the defendant as a ground for the involuntariness of the pleas is the claim that he was unaware of both the nature of the charges against him and the consequences of pleading guilty. See *Commonwealth* v. *Morrow*, 363 Mass. 601, 605 (1973); *Calabrese* v. *United States*, 507 F.2d 259, 260 (1st Cir. 1974). The contention that the defendant was unaware of the consequences of the pleas may be disposed of easily. The motion judge found that prior to

---

[7] The defendant has not argued that he was coerced by his codefendants into pleading guilty for their benefit.

the proceedings challenged in this case the defendant had had a great deal of experience with the criminal justice system, having been in court on numerous occasions on a variety of charges. On the most noteworthy of these occasions the defendant had pleaded guilty to murder in the second degree on an indictment charging murder in the first degree. At that time his counsel had explained to him the possible consequences of a guilty plea. Further, counsel who represented the defendant at the proceeding challenged here testified at the motion hearing that he had informed the defendant, prior to the entry of the pleas, of the potential results of such action, including the possibility of the imposition of the on-and-after sentences that were in fact imposed. We think that on all the evidence, including the defendant's admitted exposure in earlier cases to the pleading process, the motion judge's decision that the defendant understood the consequences of his plea is amply supported. See *Andrews* v. *Commonwealth*, 361 Mass. 722, 726 (1972).

The defendant also alleges that when he pleaded guilty he had not been satisfactorily informed of the nature of the charges against him. The Appeals Court upheld this claim on the basis that the only finding of the motion judge that indicated an express explanation of the indictments to the defendant was that counsel had "mentioned *several* of the indictments to the defendant" (emphasis in original). *Commonwealth* v. *Bolduc, supra* at 122. We consider this issue a close one, but we come to a different conclusion from that reached by the Appeals Court.

Since the defendant was apparently arraigned on only one indictment, and since the indictments were not read at the October 18 hearing, it appears that the indictments were never read in open court. That alone is not fatal to the validity of the pleas, however, nor is it fatal when coupled with counsel's statement at the hearing that the defendant "doesn't even know what . . . [the indictments] are." We believe that the motion judge, in ruling as he did, may justifiably have questioned the reliability of this representation because of the context within which it was made. At that

time, counsel was attempting to secure the assent of the judge to a recess so that he might confer with the defendant, a conference apparently intended for a discussion of the pleas rather than the indictments. Counsel's offhand statement of the defendant's ignorance of the contents of the indictments, in the circumstances in which it was made, does not compel belief of the statement.

Other evidence supports the contrary position that the charges were understood. Counsel testified that the defendant had been given copies of all the indictments, as was the practice at that time. Some degree of familiarity with the charges is also indicated by the defendant's having specifically singled out one indictment, that for assault with intent to murder, to which to plead not guilty. We think this evidence is sufficient to support the motion judge's implicit conclusion that the defendant knew the nature of the charges against him when he pleaded.

2. *Effective assistance of counsel.* The Sixth Amendment to the Constitution of the United States guarantees to a criminal defendant the right to the effective assistance of counsel at all critical stages of the proceedings against him, including at a hearing where he pleads guilty. *Boyd* v. *Dutton,* 405 U.S. 1, 2 (1972). *White* v. *Maryland,* 373 U.S. 59, 60 (1963). See *Arsenault* v. *Massachusetts,* 393 U.S. 5, 6 (1968). The defendant contends that his right was violated on two grounds: (1) that counsel was not adequately prepared to advise him at the hearing, and (2) that counsel, as attorney for him and for his two codefendants, represented conflicting interests.

As a basis for his assertion that counsel was inadequately prepared, the defendant relies on the facts that (a) counsel spoke with him for only twenty minutes before he entered his guilty pleas, (b) counsel did not examine any witnesses to the crimes, and (c) counsel did not investigate fully his background. We note that counsel did conduct numerous interviews with the codefendants, that he obtained as much information as he could from the police, and that he was an

attorney with a great deal of experience in handling criminal matters.

We have defined the standard of ineffectiveness of counsel as "serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Adams*, 374 Mass. 722, 727 (1978), quoting from *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). However, for the reason stated below, we need not consider further whether, in the abstract, the representation by counsel was adequate. In order to obtain relief on a claim of ineffective assistance of counsel a defendant must show, in addition to the claimed ineffectiveness, that "better work [by counsel] might have accomplished something material for the defense" (footnote omitted). *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). This the defendant has failed to do.

The defendant has directed our attention to no defense that he has lost as a result of his counsel's alleged inadequacy. He asserts that further investigation was necessary, but he does not indicate what facts might have been uncovered by such investigation or how they would have improved his case. Speculation that such facts existed is not enough to support this claim. See *Saferian, supra* at 98. Cf. *Commonwealth* v. *Smith*, 362 Mass. 782, 784 (1973). Any failure by counsel to conduct a satisfactory investigation into the defendant's background would be prejudicial only in the sentencing context. Since we decide below that, for other reasons, the sentences must be vacated, we are concerned here only with the effect of counsel's ineffectiveness as it relates to the entry of the guilty pleas. No prejudice has been shown by the defendant in this context and therefore his claim fails.

The defendant also contends that the assistance provided him by counsel was ineffective because counsel simultaneously represented codefendants whose interests conflicted with his own. The joint representation of clients with conflicting interests is a denial of Sixth Amendment

rights. "[T]he 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." *Glasser* v. *United States*, 315 U.S. 60, 70 (1942). The defendant suggests correctly that the violation of his Sixth Amendment rights is established on the showing of a conflict, with no requirement that resulting prejudice be proved. See *Commonwealth* v. *Smith, supra* at 784-785; *Holloway* v. *Arkansas*, 435 U.S. 475, 487-491 (1978). The existence of the conflicting interests, however, will not be inferred from the mere fact of joint representation. *Commonwealth* v. *Adams*, 374 Mass. 722, 731 (1978). *Englehart* v. *Commonwealth*, 353 Mass. 561, 562, cert. denied, 393 U.S. 886 (1968). *Holloway* v. *Arkansas, supra* at 481. *United States* v. *Foster*, 469 F.2d 1, 4 (1st Cir. 1972). Rather, the burden lies with the defendant to prove, without relying on speculation, that a conflict existed. *Adams, supra* at 731. *Smith, supra* at 784. *United States* v. *Foster, supra* at 4.

In our view two distinct questions are presented here: (1) whether counsel represented conflicting interests at the stage of the proceedings where the guilty pleas were entered, and (2) whether he did so at the sentencing stage. We agree with the ruling of the motion judge that the interests of the defendant and his codefendants were not in conflict at the pleading stage. Nothing in the context of the entry of the pleas of guilty placed the counsel under a duty "to contend [on behalf of one client] for that which duty to another client requires him to oppose." *Commonwealth* v. *Geraway*, 364 Mass. 168, 178 (1973) (Tauro, C.J., and Braucher, J., dissenting), quoting from ABA Canons of Professional Ethics No. 6. The interest of both the defendant and his codefendants lay in attaining the most favorable disposition possible. There is no evidence indicating that the course chosen by any one of the defendants, i.e., whether to plead guilty or to stand for trial, had any influence on the disposition of the case against the other defendants. This

was not a situation where an agreement had been reached between the prosecutor and the defense attorney whereby a plea of guilty by all defendants was a quid pro quo for a favorable recommendation on sentencing. See, e.g., *United States* v. *Truglio*, 493 F.2d 574, 579-580 (4th Cir. 1974). Nor was the attorney representing codefendants one of whom had agreed to testify for the prosecution and as a result stood to gain by guilty pleas from the others. See, e.g., *Commonwealth* v. *Breaker*, 456 Pa. 341, 344-346 (1974). The mere fact that the evidence against Bolduc was stronger than against the others, or that he had a more serious criminal record, does not in and of itself create a conflict. See *United States* v. *Miller*, 463 F.2d 600, 602 (lst Cir.), cert. denied sub nom. *Gregory* v. *United States*, 409 U.S. 956 (1972). The evidence implicating all three defendants in the crimes with which they were charged was apparently quite strong. It was not, therefore, unreasonable for counsel to have concluded that the greatest chance for a favorable disposition for each defendant individually lay in pleading guilty. See *United States* v. *Mari*, 526 F.2d 117, 119 (2d Cir. 1975), cert. denied, 429 U.S. 941 (1976). This does not indicate that the interests of the defendant and the codefendants were in conflict.

In the sentencing situation, however, different factors were at play, and we conclude that the interests of the defendant did indeed conflict with those of his codefendants in this context. At the time of the disposition hearing the defendant possessed a more serious criminal record than did his codefendants. He was also charged in more indictments than were the others. These circumstances made it possible for the codefendants to make a credible argument that Bolduc was the person primarily responsible for the crimes with which they were all charged. The interests of the codefendants clearly lay in taking such a course. Equally as clear, however, is that the interests of Bolduc were not advanced by such an argument. Thus, counsel's joint representation of the defendant and his codefendants placed him in a situation where action in favor of one client worked to

the detriment of the other. That counsel so clearly chose to sacrifice the interests of the defendant in an attempt to gain favorable dispositions for the codefendants is a factor that makes our decision here easier, but is not a necessary basis for it. See *Holloway* v. *Arkansas, supra* at 490-491. The joint representation of the defendant and his codefendants is enough to require a ruling that, as to his sentencing, the defendant's Sixth Amendment right to the effective assistance of counsel was violated. See Geer, Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney, 62 Minn. L. Rev. 119, 134-135 (1978).

3. *Conclusion.* We therefore conclude that, while the defendant's guilty pleas must stand, the sentences must be, and are, vacated, and the cases are remanded to the Superior Court for new sentencing.

*So ordered.*