COMMONWEALTH vs. RICHARD E. LESLIE.

Essex. September 12, 1978. — November 16, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Constitutional Law*, Assistance of counsel. *Practice, Criminal*, Assistance of counsel, New trial, Instructions to jury. *Conflict of Interest. Attorney at Law. Burglary.*

An attorney did not have a material conflict of interest in representing a defendant in a criminal case simply because the victim was a friend of the wife of a lawyer with whom the defense counsel shared office space and secretarial services. [649–655] LIACOS, J., concurring.

In the context of the judge's entire charge to the jury, there was no error in his explanation of the elements of charge of burglary with assault. [655–656]

INDICTMENT found and returned in the Superior Court on September 30, 1974.

The case was tried before *Coddaire, J.*

A motion for a new trial was heard by *Irwin, J.*

The Supreme Judicial Court granted, with respect to both proceedings, a request for direct appellate review.

*Stephen Hrones* for the defendant.

*John C. Doherty*, Assistant District Attorney, for the Commonwealth.

___

KAPLAN, J. Tried on indictments charging assault with intent to murder (G. L. c. 265, § 15), assault with intent to commit rape (G. L. c. 265, § 24), burglary with assault (G. L. c. 266, § 14), and assault and battery (G. L. c. 265, § 13A), the defendant Richard E. Leslie on June 23, 1975, was acquitted by a jury of the first two charges, and convicted of the others; the assault and battery conviction, however, was dismissed by the trial judge as "duplicitous."[1] The defendant appeals from the conviction of burglary pursuant to G. L. c. 278, §§ 33A-33G; error is claimed in the judge's charge defining the crime. About two years after the conviction the defendant moved for a new trial on a claim that he was denied his right to effective counsel because of a conflict of interest on the part of the trial attorney he retained. The motion was denied after a hearing at which evidence was received, and an appeal is taken from the order, also pursuant to G. L. c. 278, §§ 33A-33G. We took the case on both its phases for direct appellate review.

We indicate briefly the nature of the criminal event; then deal with the alleged conflict of interest; and examine finally the question of the charge to the jury.

About midnight, June 16, 1974, two police officers found the defendant, a twenty-five year old man, in the Lawrence home of Mrs. Claire Carney, fifty-one years old, wife of Joseph L. Carney, a local police officer. The defendant was stooped over Mrs. Carney. She was in night attire, dishevelled, bruised, crying hysterically. Mrs. Carney testified she had never seen the defendant before the night of the assault, that he had entered the house, opening a closed door, asked her for money, punched her repeatedly, and, shortly before the police arrived, thrown her on a bed and started to undo his pants. The defendant's version of the incident was that he was known to Mrs. Carney in her job as a welfare worker; that she had encountered him in a supermarket that afternoon, and,

---

[1] The defendant was sentenced to a term of twelve to fifteen years.

observing that he was distressed at the time, had invited
him to come to her house at 10:30 or 11 P.M. for a talk;
that he arrived late and walked through a door partly
open; and that Mrs. Carney's bruises came when he
pushed her in attempting to escape from the police. There
were problems for the trial lawyers on either side, as not
much telling evidence could be found besides the assever-
ations of the accused and the victim.

Now we recount what was brought out at the new trial
hearing about counsel's representation of the defendant
(the presiding judge was not the one who had tried the
case). The defendant's girl friend retained Mr. Harvey
Brower shortly after the arrest in June. Mr. Brower was
a single practitioner with a busy criminal practice. Since
1972 or 1973 he had shared office space with Mr. Ignatius
Piscitello, a friend and fellow lawyer, at 11 Lawrence
Street in the city of Lawrence. To some extent the two
shared the services of secretaries, and they freely used
each other's reference books. For a time they shared a
telephone number. They had independent practices but
on occasion they stood in for each other at minor appear-
ances in court[2] or gave other mutual assistance, and
sometimes one might refer a client to the other. They did
not share fees or (except as indicated) expenses of prac-
tice. They were not partners. It was shown that in 1975
the Lawyers Diary had bracketed their names, but Mr.
Piscitello testified that he wrote the editors to correct this
erroneous suggestion of a partnership.

When Mr. Piscitello learned that Mr. Brower had ac-
cepted or was about to accept a retainer from the defend-
ant, he spoke to Mr. Brower and urged him to stay out of
the case. He said this was a notorious crime involving a
policeman's wife and a sexual assault; he believed the
defendant was guilty; Mr. Brower would be hurt in public

---

[2] The defendant testified that Mr. Brower at one point told him that
Mr. Piscitello might make such an appearance, but in fact Mr. Piscitel-
lo did not do so.

estimation by appearing for the defense, and, by indirection, Mr. Piscitello would also be hurt. Mr. Piscitello added (what Mr. Brower had not known) that Mrs. Piscitello was a good friend of the victim Mrs. Carney from the time, many years since, when their families had been close neighbors. (Mr. Piscitello knew Mrs. Carney, but not through his wife: he had represented some of Mrs. Carney's welfare clients. Mr. Brower had not known Mrs. Carney at all.[3]) Mr. Brower's reaction to the admonition about offending the community was, "So what," and as to discomfiting Mr. or Mrs. Piscitello[4] he said it was none of Mr. Piscitello's concern whom he chose to represent.

The defendant Leslie testified on the motion that, on a few occasions, coming to the offices at 11 Lawrence Street to pay small instalments of Mr. Brower's fee, and finding Mr. Brower absent, he had handed the money to Mr. Piscitello or a secretary for Mr. Brower.[5] At one of those encounters Mr. Piscitello told the defendant that his wife was a friend of Mrs. Carney. Once the defendant, entering the lobby of 11 Lawrence Street, saw Mr. Piscitello talking to Mrs. Carney (her welfare office was in the same building). When the defendant mentioned these Piscitello associations to Mr. Brower, Mr. Brower emphasized that he, not Mr. Piscitello, was representing the defendant.

Mr. Brower appeared for the defendant at trial without assistance from Mr. Piscitello or any other lawyer. The transcript, made available on the new trial motion (and to this court), runs to 370 pages. The defendant made no

[3] Both lawyers were acquainted through their practice with the victim's husband as a Lawrence police officer but there was no social relationship.

[4] Mr. Piscitello testified that, as far as he himself was concerned, he could not possibly have represented the defendant because he had "to go home every night."

[5] Another minor service performed by Mr. Piscitello for Mr. Brower in the case was to notarize a subpoena for the production of Mrs. Carney's hospital record. (Mr. Brower was not a notary.) The bill for service of the subpoena was addressed to Mr. Piscitello.

complaint at the time about trial counsel's conduct of the case, but on the motion, in the attempt to show prejudice traceable to counsel's supposedly conflicted position, the defendant criticised the tactical decision not to cross-examine Mrs. Carney after her direct testimony (counsel did cross-examine her after she testified in rebuttal). The particular maneuver, according to Mr. Brower, was adopted after analysis of the testimony of Mrs. Carney at a probable cause hearing which indicated that cross-examination after the direct would not diminish and might further impress the prosecutor's case in the minds of the jury. The defendant pointed also to counsel's omitting any exception to the judge's charge and to laxities on counsel's part at the stage of appeal.[6] Here connection with the alleged conflict of interest becomes quite attenuated. (The legal point about the charge, such as it is, is dealt with later in this opinion.)

Upon subsidiary findings not subject to serious dispute summarizing the testimony on the motion, the judge made inferential or conclusory findings which were negative as to conflict of interest and also regarding the question of prejudice, i.e. whether counsel was affected in his defense by any conflict. Instead, the judge concluded that there was no evidence that Mr. Brower was consciously affected by his knowledge of Mrs. Piscitello's relationship to Mrs. Carney, nor any evidence that the defense was inadequate or ineffective.

Reviewing the motion judge's decision, we accept that if a genuine conflict of interest could be shown, the defendant would have a constitutional right under the Sixth and Fourteenth Amendments or art. 12 of our Declaration of Rights to avoid the judgment of conviction, and this without having to demonstrate actual prejudice. See *Commonwealth* v. *Bolduc*, 375 Mass. 530, 540-543 (1978), and authorities cited; *Holloway* v. *Arkansas*, 435 U.S. 475, 487-489 (1978);[7] *Glasser* v. *United States*, 315

---

[6] See note 17, *infra*.

[7] Here the Court held reversal of conviction was required regardless of prejudice where the trial court improperly denied defendant's motion for separate representation of codefendants.

U.S. 60, 96 (1942).[8] We are also prepared to assume that if a more remote conflict appeared, there might still be ground for overthrowing the judgment upon a showing of material prejudice. See *Miller* v. *United States*, 564 F.2d 103, 106-107 (1st Cir. 1977), cert. denied, 435 U.S. 931 (1978); *Foxworth* v. *Wainwright*, 516 F.2d 1072, 1077 n.7 (5th Cir. 1975).

It is of course crucial to the integrity of the whole forensic process that counsel's loyalty to his client should be full and undivided,[9] but this principle, like others, becomes stultifying if not applied with common sense. Mr. Brower's willingness to risk popular displeasure in defending a person accused of atrocious crime was commendable rather than otherwise;[10] he is criticised for un-

---

[8] A question might be raised about the existence of "State action" where counsel was retained rather than appointed, see *Fitzgerald* v. *Estelle*, 505 F.2d 1334 (5th Cir. 1974), cert. denied, 422 U.S. 1011 (1975), but the reasoning of *Pires* v. *Commonwealth*, 373 Mass. 829, 833-834 (1977), is persuasive that the constitutional position should be the same for both cases. The conclusion is especially clear in conflict of interest situations as it would usually be most unrealistic to hold the defendant responsible for that vice in the representation afforded him by his retained counsel. Cf. *United States ex rel. Hart* v. *Davenport*, 478 F.2d 203, 210-211 (3d Cir. 1973). Further, there is authority for the general position that the State adjudicatory machinery is sufficiently involved in proceedings affected by the divided loyalties to satisfy a State action requirement. See *United States* v. *Alvarez*, 580 F.2d 1251, 1255-1257 (5th Cir. 1978); *United States* v. *Foster*, 469 F.2d 1, 4 n.2 (1st Cir. 1972). Cf. *Commonwealth* v. *Gauthier*, 361 Mass. 394, 400 n.12, cert. denied, 409 U.S. 869 (1972).

If a constitutional claim could not be maintained, we would still insist that a serious breach of professional standards with regard to counsel's duty of undivided fidelity should result in impeachment of the conviction. (Under G. L. c. 278, § 29, a new trial may be ordered "[i]f it appears to the court that justice may not have been done." Cf. note 14, *infra*.)

[9] See S.J.C. Rule 3:22, adopting ABA Code of Professional Responsibility, Canon 5, 359 Mass. 814 (1972); ABA Standards Relating to The Prosecution Function and The Defense Function § 3.5(a) (1971).

[10] The motion judge very properly indicated his recognition of the duty of the Bar to give adequate legal representation to unpopular members of the community. Note that in England the duty is enforced

dertaking the case because the victim, though unknown to him, turned out to be a friend of the wife of a fellow lawyer with whom he had a loose professional association. The imputation is that, having accepted a retainer despite a possibly negative public reaction, he would then go soft in dealing with the victim as an adverse witness because of a relationship with her twice removed.

This was not a situation of conflict which called for abstention on Mr. Brower's part; to hold that it was, indeed, would put peculiar obstacles in the way of the practice of criminal law, particularly in smaller communities where local lawyers know most of the citizenry. The situations that give rise to per se disqualifications in criminal matters are typically quite different: A lawyer represents codefendants whose lines of defense are perceived to be inconsistent or contradictory.[11] Or has a business reason for preferring a verdict unfavorable to the defendant he represents.[12] Or sustains an attorney-client or direct and close personal relationship with a material prosecution witness.[13]

---

by the general "cab rank" principle which obligates a barrister to accept at usual rates any brief within his competence and available time, regardless of the identity of the client. A barrister may decline a brief for personal reasons, but these are strictly construed. See W. Boulton, Conduct & Etiquette at the Bar 22 (6th ed. 1975).

[11] Compare *Commonwealth* v. *Bolduc,* 375 Mass. 530, 540-543 (1978), and *Glasser* v. *United States,* 315 U.S. 60 (1942), with *Commonwealth* v. *Adams,* 374 Mass. 722, 731 (1978), and *United States* v. *Lovano,* 420 F.2d 769 (2d Cir.), cert. denied, 397 U.S. 1071 (1970).

[12] See *United States* v. *Hurt,* 543 F.2d 162 (D.C. Cir. 1976); *People* v. *Corona,* 80 Cal. App. 3d 684, 719-727 (1978). Cf. *Hafter* v. *Farkas,* 498 F.2d 587 (2d Cir. 1974).

[13] Compare *Castillo* v. *Estelle,* 504 F.2d 1243 (5th Cir. 1974), *Taylor* v. *United States,* 226 F.2d 337 (D.C. Cir. 1955), *United States* v. *LaVallee,* 282 F. Supp. 968 (E.D.N.Y. 1968), *United States ex rel. Miller* v. *Myers,* 253 F. Supp. 55 (E.D. Pa. 1966), *People* v. *Stoval,* 40 Ill. 2d 109 (1968), and *State* v. *Moser,* 78 N.M. 212 (1967), with *Commonwealth* v.

Commonwealth v. Leslie.

The defendant seeks to bring his case within *Commonwealth* v. *Geraway*, 364 Mass. 168 (1973), where a conflict of interest was found sufficient to vitiate a conviction although there was admittedly slight if any evidence of actual prejudice in the conduct of the trial. *Id.* at 174.[14] That case divided the Justices, 3-2, and was considered borderline, but the conflict found was more palpable there than any suggested here. Of the six witnesses who testified to admissions by the defendant, four, and some of their immediate family, had been or were currently clients of the firm representing the defendant, although their matters were not related to that defense. Three of the four had been counseled by a partner about giving information to an investigating officer before trial. One of the four was himself under suspicion of having committed the murder. The partner who tried the *Geraway* case evidently was not conscious of the facts held to create the conflict,[15] but his partners in the firm (not just sharers of office space) knew them. The defendant inquired particularly of the partner preparing for trial whether there was not a conflict of interest as to the man suspected of the crime, and was told erroneously (if innocently) that he was not even known to the firm.[16] The majority of the Justices, in substantial degree identifying the defense

*Smith,* 362 Mass. 782 (1973), *United States* v. *James,* 505 F.2d 898 (5th Cir.), cert. denied, 421 U.S. 1000 (1975), and *Weaver* v. *United States,* 263 F.2d 577 (8th Cir.), cert. denied, 359 U.S. 1014 (1959). Cf. *Zurita* v. *United States,* 410 F.2d 477 (7th Cir. 1969). See generally Annot., 27 A.L.R.3d 1431 (1969).

[14] Doubting whether a constitutional violation could be made out, *id.* at 174, the majority relied on the discretionary powers of this court in capital cases under G. L. c. 278, § 33E.

[15] However, one of the partners testified that he had probably discussed a possible conflict of interest with his partner who tried the case. *Id.* at 173 n.4.

[16] By contrast, the defendant in the present case knew the situation. But we are not suggesting a waiver on his part. See *Glasser* v. *United States,* 315 U.S. 60, 70-72 (1942); *United States* v. *Hurt,* 543 F.2d 162, 168 n.34 (D.C. Cir. 1976).

counsel with his partners, saw a web of "ethical and economic" factors in *Geraway* amounting to conflict. *Id.* at 173. The *Geraway* case is far from controlling the present case.

As there is no material conflict of interest in the present case, any issue of prejudice falls out. See *Commonwealth* v. *Smith*, 362 Mass. 782, 784 (1973). But should the question be reached, we would agree with the judge's negative assessment. Mr. Brower succeeded over odds in obtaining acquittal of two serious charges and dismissal of a third charge. We have no basis for faulting his handling of Mrs. Carney as an adverse witness. Thus the defendant is reduced to his grievance about the judge's charge. Counsel may be thought less than vigilant because he failed to register an objection, and the subsequent history given in the margin,[17] recalls our recent strictures in *Pires* v. *Commonwealth*, 373 Mass. 829, 834-835 (1977), about the responsibilities of trial lawyers for preserving rights of appeal. Yet, as already intimated, it would be hard to relate any faults here to the alleged conflict of interest.

Overlooking the defendant's failure to object at the time, we come to the merits of the judge's instructions to the jury. The defendant says there was error in the judge's failing to state that assault was an element of the crime of burglary charged under G. L. c. 266, § 14. Although the judge in his initial description of that crime devoted little attention to the assault, he pointed out that the burglary indictment alleged that the accused "did commit an assault," and he later explained that in all the indictments "there is an allegation and an element of the

[17] Counsel did not take an appeal from the judgment. He said he was not retained to do so. However, he moved for a new trial on the ground of the misdirection, which was denied. He was late in perfecting an appeal from the order. Fresh counsel applied successfully to a single justice of this court for an extension of time in which to file an assignment of errors on the burglary indictment, and an assignment was perfected.

crime that the defendant did assault or did assault and beat" the victim. He also defined assault in the course of his instructions. Taking the instructions as a whole (see *Commonwealth* v. *Fitzgerald, ante* 402, 425 [1978]), we think they fairly informed the jury of the several components of the crime.

*Judgment affirmed.*

*Order denying a new trial affirmed.*

LIACOS, J. (concurring). I agree with the majority that the existing case law does not dictate a holding here that the defendant was deprived of the effective assistance of counsel. I am disturbed, nevertheless, by what I perceive as the court's tacit approval of trial counsel's behavior. Mr. Brower's willingness to take the case in spite of its unpopularity is doubtless praiseworthy, but cannot suffice to immunize his conduct from further scrutiny.

One element of the "fundamental and absolute" right to counsel is the full and undivided loyalty of attorney to client. *Glasser* v. *United States*, 315 U.S. 60, 75-76 (1942). I am not convinced that counsel here demonstrated the requisite sensitivity to, and respect for, this principle. Mr. Brower was notified by his professional associate, Mr. Piscitello, that Mr. Piscitello's wife was "good friends" with the victim of the crime. When Mr. Piscitello urged Mr. Brower not to take the case for several reasons, including his wife's relationship with the victim, Mr. Brower replied, "So what," and told Mr. Piscitello to mind his own business.

So glib a reply is particularly suspect in light of the real incidents of Mr. Brower's association with Mr. Piscitello. While the two attorneys were not partners, they shared secretarial help and library facilities, and consulted each other on some cases. With relation to the instant matter, on one occasion Mr. Brower told the defendant that his

(Brower's) absence from a hearing on the case would not make any difference since Mr. Piscitello was there from his office and would represent the defendant if necessary. Further, Mr. Piscitello accepted money from the defendant on Mr. Brower's behalf, subpoenaed hospital records for the case, and was billed for these. Thus, while Mr. Piscitello's active involvement with the case may have been only tangential, Mr. Brower clearly availed himself of tangible attributes of their mutual association in regard to this case.

Mr. Brower was well aware of Mr. Piscitello's serious personal and professional misgivings about his having taken the case. Mr. Brower admitted that Mr. Piscitello's relationship to the victim could have had a subconscious effect on him. Without engaging in an extensive psychoanalytic exploration, I am left with the uncomfortable feeling that Mr. Brower's advocacy for his client might well have been dampened by these countervailing considerations.

A look at a few of the provisions of the Code of Professional Responsibility of the American Bar Association is instructive.

Canon 5: "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client."[1] EC 5-1: "The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and *free of compromising influences and loyalties.* Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client" (emphasis supplied). EC 5-21: "The obligation of a lawyer to exercise professional judgment solely on behalf of his client requires that he disregard the desires of others that might impair his free judgment. The desires of a third person will seldom adversely affect a lawyer unless that person is in a position

---

[1] See S.J.C. Rule 3:22, adopting ABA Code of Professional Responsibility, Canon 5, 359 Mass. 814 (1972).

to exert strong economic, political, or social pressures upon the lawyer. These influences are often subtle, and a lawyer must be alert to their existence. *A lawyer subjected to outside pressures should make full disclosure of them to his client; and if he or his client believes that the effectiveness of his representation has been or will be impaired thereby, the lawyer should take proper steps to withdraw from representation of his client"* (emphasis supplied).

The quoted language emphasized highlights my concern here, namely, the extent of Mr. Brower's disclosure to the defendant of the arguable potential for divided loyalty in the handling of this case. The record indicates that on one occasion the defendant saw Mr. Piscitello talking to the victim. When he related this observation to his attorney, Mr. Brower merely told him not to worry "because Piscitello is not representing him."

A defendant in a criminal case is entitled to expect loyalty from his counsel, and is entitled to an explanation of behavior which casts doubt on that loyalty. In this case, the defendant deserved more than a cursory dismissal of his stated concerns. He should have been informed fully of the outside pressures on his attorney, and of the facts creating such pressures, whether or not that attorney had already convinced himself that he was impervious to their influence. On full disclosure of all the facts, including Mr. Piscitello's expressed desire that Mr. Brower not take the case, the defendant should have been given the opportunity to decide whether the effectiveness of his counsel's representation had been, or would be, impaired thereby. If the defendant decided that he could no longer be represented effectively, or that he no longer wished to have Mr. Brower represent him for any reason, Mr. Brower would have been obliged to take appropriate steps toward withdrawal from the case.

I agree with the majority in its holding that the circumstances here do not mandate a per se disqualification of Mr. Brower. Nor do I think that the case law supports the

view, propounded by the defendant, that the conflicts inherent in Mr. Brower's position give rise to a deprivation of constitutional magnitude. But I view influences such as those involved here as significant nonetheless, calling for serious, thoughtful consideration by counsel, and full disclosure to the client.