NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13356

COMMONWEALTH  vs.  ANTHONY DEW.


Suffolk.     February 8, 2023. - June 15, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Constitutional Law, Assistance of counsel.  Due Process of Law,
    Assistance of counsel.  Practice, Criminal, Assistance of
    counsel.  Attorney at Law, Conflict of interest, Attorney-
    client relationship.  Conflict of Interest.



Indictments found and returned in the Superior Court
Department on March 11, 2015.

    A motion for a new trial, filed on September 20, 2021, was
heard by Janet L. Sanders, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Edward B. Gaffney for the defendant.
    Adam Murphy, of New York (Catherine Logue, of New York,
also present) for NAACP Legal Defense & Educational Fund, Inc.,
& another.
    Ana M. Francisco (Mirian Albert also present) for Council
on American-Islamic Relations -- Massachusetts & others.
    Paul B. Linn, Assistant District Attorney, for the
Commonwealth.
    Stanley Donald, pro se, amicus curiae, submitted a brief.

WENDLANDT, J.   The defendant, Anthony J. Dew, is a Black man of the Muslim faith.   Indigent and facing multiple felony charges, the defendant was appointed counsel who openly posted, on his social media account, his vitriolic hatred of and bigotry against persons of the Muslim faith; his unabashed anti-Muslim rants were matched only by his equal scorn for and racism against Black persons.   Some of these postings occurred while counsel was representing the defendant.   Indeed, counsel's intolerance and prejudice seeped into his representation of the defendant.   At least twice, counsel chastised the defendant for wearing religious garb, demanding that the defendant not wear "that shit" again; once, he refused to speak to the defendant because the defendant was wearing a kufi prayer cap in contravention of counsel's directive.   At their final meeting, counsel advised the defendant to accept a plea deal, which the defendant did.   Several years later, counsel's bigotry came to the attention of the Committee for Public Counsel Services (CPCS), which suspended him for no less than one year as a result.   After learning of counsel's anti-Muslim, racist postings, the defendant filed a motion to withdraw his guilty plea and obtain a new trial on the ground that his court-appointed counsel had an actual conflict of interest.

We conclude that the conflict of interest inherent in

counsel's bigotry against persons of the defendant's faith and race, which manifested during counsel's representation of the defendant, deprived the defendant of his right to effective assistance of counsel -- a right upon which our entire system of criminal justice depends to ensure a "fair trial."  See Gideon v. Wainwright, 372 U.S. 335, 344 (1963).  See also Lavallee v. Justices in the Hampden Superior Court, 442 Mass. 228, 235 (2004), citing Strickland v. Washington, 466 U.S. 668, 685 (1984).  No additional showing of "prejudice" is required.  The motion judge's conclusion to the contrary was in error; we now vacate the defendant's convictions and remand for a new trial.[1]

1.  Background.  The following facts, found by the motion judge, are largely undisputed.[2]  The defendant is a Black man of the Muslim faith.  In March 2015, the defendant was indicted on nineteen charges, including five counts of trafficking a person for sexual servitude, in violation of G. L. c. 265, § 50 (a)

---

[1] We acknowledge the amicus briefs submitted by the Council on American-Islamic Relations -- Massachusetts, the Muslim Justice League, Lawyers for Civil Rights, Massachusetts Black Women Attorneys, the Massachusetts Law Reform Institute, the Hispanic National Bar Association, Citizens for Juvenile Justice, and the Justice Resource Institute; NAACP Legal Defense & Educational Fund, Inc., and the New England Innocence Project; and Stanley Donald.

[2] "In examining the defendant's claim that his counsel was ineffective, we accept the motion judge's subsidiary findings of fact absent clear error."  Commonwealth v. Smiley, 431 Mass. 477, 481 (2000), citing Commonwealth v. Yesilciman, 406 Mass. 736, 743 (1990).

(trafficking charges); and one count of rape, in violation of G. L. c. 265, § 22 (b) (rape charge).[3] In February 2016, Richard Doyle was appointed to represent the defendant.

During one of the first encounters between the defendant and Doyle, the defendant was wearing a kufi prayer cap. Doyle demanded that the defendant remove his religious garb, instructing him, "Don't come in this room like that ever."[4] At a meeting approximately two weeks later, Doyle left without speaking with the defendant upon seeing that the defendant again was wearing a kufi. Doyle again met with the defendant at the court house shortly before the scheduled trial date in May 2016. At this meeting, Doyle chastised the defendant, in front of a

---

[3] The defendant was also indicted on two counts of assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15A (b); one count of assault and battery, in violation of G. L. c. 265, § 13A; one count of a second and subsequent offense of possession of a class A substance with intent to distribute, in violation of G. L. c. 94C, § 32 (b); six counts of distributing a class A substance, in violation of G. L. c. 94C, § 32 (a); and three counts of distributing a class B substance, in violation of G. L. c. 94C, § 32A (a).

[4] The motion judge found that, at this meeting, Doyle said "not to wear that shit in a courtroom." The record supports that Doyle made this statement; however, at the hearing on his motion, the defendant testified that Doyle made the statement not to "wear that shit in court at all" at a later meeting during which he advised the defendant to accept the plea offer and said, "Don't come in this room like that ever," at this initial meeting. Accordingly, we defer to the motion judge's finding as to Doyle's statements; however, the additional finding as to when the statements were made was clearly erroneous. See Smiley, 431 Mass. at 481.

court officer, not to wear "that shit" -- an apparent reference to the defendant's kufi -- in court. Doyle also advised the defendant to accept a plea offer and informed him that any attempt to seek new appointed counsel would likely be futile on the eve of trial.

In June 2016, the defendant pleaded guilty to all but the rape charge as part of a plea agreement pursuant to which the prosecutor agreed to dismiss the rape charge.[5] The trial judge conducted a colloquy during which the defendant stated that he was satisfied with counsel's representation and that no one had pressured him into pleading guilty. As was recommended in the agreement, the trial judge sentenced the defendant to concurrent terms of from eight to ten years in State prison for four of the five counts of trafficking a person for sexual servitude, in violation of G. L. c. 265, § 50 (a), and the count charging a

---

[5] The prosecutor summarized the facts supporting the charges as follows: "The [d]efendant . . . organiz[ed] and r[an] a human trafficking and drug distribution operation . . . out of two apartments in Dorchester . . . [between] sometime in 2014 and January 15, 2015." The defendant allegedly attempted to recruit one victim "to work for him as a prostitute," offering to provide her housing and heroin. The prosecutor alleged that the defendant assaulted this victim and that the defendant had multiple persons "prostituting for him" in exchange for illegal drugs. A search of the defendant's home pursuant to a search warrant, the prosecutor described, led to the discovery of several items, including heroin, a digital scale, and certain "indicia of prostitution." The prosecutor considered it "a strong case for the government" because, inter alia, the complaining witnesses were willing to testify.

second and subsequent offense of possession of a class A substance with intent to distribute, in violation of G. L. c. 94C, § 32 (b).  On the remaining counts, the judge sentenced the defendant to seven years of probation from and after his incarceration.

Unbeknownst to the defendant, from at least 2014 through 2017, including during the time Doyle represented the defendant, Doyle made and shared[6] numerous racist and bigoted public[7] postings on his social media account, reflecting prejudice against Black persons and persons of the Muslim faith.  These posts, which we set forth in the margin,[8] included a variety of anti-Muslim slurs and statements calling for violence against and celebrating the death of persons of the Muslim faith,[9] posts

---

[6] A "shared" post occurs when a user shares on his or her own page (or "Feed") a post originally written and posted by someone else; shared posts can be preceded by the user's own commentary.  See Facebook Help Center, How Do I Share a Post I See on My Feed on Facebook, https://www.facebook.com/help /163779957017799 [https://perma.cc/NX9V-RFAL].

[7] Doyle's account was "public"; accordingly, his posts were available to anyone using the social media platform regardless of whether Doyle had designated the viewer as a "friend." Additionally, CPCS determined that some of Doyle's approximately 700 "friends" were former clients.

[8] We include descriptions of the posts because Doyle's own words best capture the depth of his bigotry.

[9] Doyle's anti-Muslim posts included the following:

1.  A shared post of a photograph of a pig with engorged

mocking Black individuals,[10] and comments, some apparently made

testicles, captioned, "Dear Muslims . . . Kiss our big bacon balls";

2.   A post stating, "I just became a bigger Hockey fan . . . I guess Canadians want to protect their citizens, I wish our government would . . . ," accompanying a photograph of a Canadian hockey announcer, with a quotation:  "If hooking up one raghead terrorist prisoner's testicles to a car battery to get the truth out of the lying little camel shagger will save just one Canadian life then I . . .";

3.   A shared post of a picture of a pointing military officer, captioned, "You tell those goat fuckers with the laundry on their heads that it's wash day, and we're bringing the fucking Maytag!";

4.   Doyle's statement, "Allah be praised.  Go meet your 72 fat, smelly virgins, asshole," accompanying a shared post of a video recording apparently depicting the death of a man while attempting to use an explosive device, with a description saying, "When goat fuckers use mortar hahaha";

5.   A shared post stating, "In Islam, you have to die for Allah.  The God I worship died for me";

6.   A shared post depicting a cartoon figure of a man sitting at a desk, captioned, "Let's not jump to conclu. . . aaaaand it's Muslims"; and

7.   A shared post of a drawing of a man stating, "When liberals aren't busy bashing peaceful Christians, they're making excuses for Muslims cutting people's heads off."

[10] Doyle's racist posts included the following:

1.   A shared post of a poster for the movie "The WaterBoy," with the name and face of Colin Kaepernick, a Black football player and civil rights activist;

2.   A shared post of a collage of three photographs -- one of Black men wearing shirts with the words, "Trump & Republicans Are Not Racist," one of a Black man in a "Make

at a State court house,[11] seemingly referring to Doyle's clients as "thugs"[12] and suggesting that Doyle's nonwhite clients were criminals.[13]

---

America Great Again" hat, and one of two Black men wearing cowboy hats and a shirt and bandana with the confederate flag -- captioned, "5 minutes after Trump legalizes weed in all 50 states"; and

3.  A shared post of two photographs, one depicting Black men posing with guns captioned, "Don't glorify shooting people," and the other showing distraught Black men captioned, "Then cry like a bitch when someone you love gets shot."

[11] Some posts indicate that Doyle's "check in" location was a State court house.  "A . . . check in is a post linked to a location . . . ."  John, How to Check in on Facebook from a Desktop or Mobile Device, Bus. Insider (Apr. 29, 2019), https://www.businessinsider.com/guides/tech/how-to-check-in-on-facebook [https://perma.cc/9WHS-5FAE].

[12] The term "thug" has been described by one linguist as a "nominally polite way of using the N-word."  The Racially Charged Meaning Behind the Word "Thug," NPR (Apr. 30, 2015), https://www.npr.org/2015/04/30/403362626/the-racially-charged-meaning-behind-the-word-thug [https://perma.cc/34K5-VD4C].

[13] Doyle's court house posts included the following:

1.  Doyle's statement referencing winning a trial for a seventy-six year old Italian national stopped for speeding, followed by Doyle's comment stating, "I can walk away from this one without feeling dirty.  Doesn't happen much," and Doyle's reply of "Hell yeah" to a comment asserting, "U love bathing in the filth, as long as it's green";

2.  Doyle stating, "Beat another gun case today," followed by a comment stating, "It was someone else's shotgun.  Client not a bad guy," and Doyle's response "Absofuckinglutely right, Chief!  Job security in the Roxbury District Court" to a comment that stated, "Don't worry he'll be retaining you again soon";

In 2017, CPCS investigated a complaint against Doyle and concluded, based on the social media posts, that Doyle violated his duty of loyalty to his Muslim and "other non-Caucasian" clients; CPCS suspended Doyle from criminal case assignments for a period of one year and required Doyle to take ethics and cultural competency courses.[14]

The defendant was unaware of Doyle's bigotry until 2021, well after his agreement to the plea deal, when he was shown Doyle's posts; prior to that time, the defendant did not attribute Doyle's comments regarding the defendant's religious garb to racism or to animus against persons of the Muslim faith.

---

3. Doyle's statement, "Not Guilty. Firearm. Makes you feel a whole lot safer, huh?" along with a series of comments in which Doyle stated, "I went to the dark side," "Between you and me, he should stop gang-banging," and "He wanted his cell phones (with business contacts, no doubt) and his baseball hats back. I told him to go home and Jerry off. . . . Jerk off, that is";

4. A "check in" by Doyle at "Suffolk County Superior Court," stating, "Poor, misguided children," and a comment by Doyle stating, "Waaaaaahhhhhh!!!!!!";

5. A "check in" by Doyle from "Suffolk County Courthouse," stating, "Assorted thugs and bad guys"; and

6. Doyle's statement, "Yesterday, a 21 y.o. punk client told me: 'I don't like your attitude, Doyle,'" followed by Doyle's comments saying, "I told him to come back with a new lawyer or a toothbrush," and ". . . soap on a rope for a going away present . . . ."

[14] Doyle died in March 2021, before the defendant filed his motion for a new trial.

After learning of the posts, the defendant filed a motion for a new trial and for leave to withdraw his guilty pleas; he claimed, inter alia, that Doyle had an actual conflict of interest and thus Doyle's representation of him violated his right to the effective assistance of counsel under art. 12 of the Massachusetts Declaration of Rights and the Sixth Amendment to the United States Constitution.

After an evidentiary hearing, the motion judge denied the motion. She concluded that absent a showing of prejudice or "any showing that [Doyle's] views affected [his] representation of the defendant," the defendant was not entitled to withdraw his guilty plea.[15] Rejecting the defendant's argument that

---

[15] Applying the usual framework to assess claims of ineffective assistance of counsel, which requires determination "whether there has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer -- and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence," Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), the motion judge found no evidence to suggest that the defendant was coerced into accepting the plea or that the plea offer was unreasonable. Notably, the trafficking charges carried a minimum sentence of five years in State prison and a maximum sentence of twenty years. G. L. c. 265, § 50 (a). The rape charge, which was dismissed pursuant to the parties' plea deal, would have carried a term of "not more than twenty years" in State prison. G. L. c. 265, § 22 (b). See Commonwealth v. DeJesus, 468 Mass. 174, 183 (2014), quoting Commonwealth v. Clarke, 460 Mass. 30, 47 (2011), abrogated in part by Chaidez v. United States, 568 U.S. 342 (2013) (typically prejudice prong requires showing that "there is a reasonable probability that a different plea bargain . . .

nonetheless he was entitled to withdraw his plea because Doyle had an actual conflict of interest in representing Black, Muslim individuals, the judge explained that defense counsel and his or her client need not "share the same worldview," that "criminal defense attorneys often have to represent people who in their opinion have committed reprehensible acts," and that "a lawyer who expresses racist views in his personal life" is not "presumed ineffective any time that he or she represents a client of color."[16]  The defendant timely appealed, and this court granted his application for direct appellate review.

2. Discussion. a. Standard of review.  "[W]e review a judge's denial of a defendant's motion for a new trial to determine whether there has been a significant error of law or other abuse of discretion."  Commonwealth v. Tate, 490 Mass. 501, 505 (2022), quoting Commonwealth v. Caldwell, 487 Mass. 370, 374 (2021).  "Where an evidentiary hearing is conducted on a motion for a new trial, we 'accept the [judge's] findings where they are supported by substantial evidence in the record,'

could have been negotiated at the time").  The defendant does not challenge this conclusion on appeal.

[16] The judge found "[p]erhaps most important" that "the defendant himself did not draw a connection between Doyle's expressed distaste for his wearing a kufi and any advice that Doyle gave him in accepting a plea," concluding that "no matter how disturbing Doyle's personal views were, there [was] no indication in the factual record . . . that they influenced Doyle's representation of the defendant."

and we 'defer to the judge's assessment of the credibility of witnesses.'" Tate, supra, quoting Commonwealth v. Jacobs, 488 Mass. 597, 600 (2021). However, we "make an independent determination as to the correctness of the judge's application of constitutional principles to the facts as found." Caldwell, supra, quoting Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011).

b. Effective assistance of counsel. It is difficult to overstate the essential importance of the right to counsel[17] in our adversary system of criminal justice. See United States v. Cronic, 466 U.S. 648, 653 (1984) (accused person's right to counsel "is a fundamental component of our criminal justice system"). The procedural and substantive safeguards that define our criminal justice system and are designed to assure that the accused receives fair proceedings and a fair trial largely would

---

[17] The fundamental right to counsel has "deep roots in Massachusetts history":  "[a]s early as the 1790s, this court began appointing defense counsel for defendants in capital cases tried before it." Carrasquillo v. Hampden County Dist. Courts, 484 Mass. 367, 371 & n.4 (2020), citing Commonwealth v. Hardy, 2 Mass. 303, 303 (1807). The right to counsel is secured both by the Sixth Amendment to the United States Constitution, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence," and by art. 12 of the Massachusetts Declaration of Rights, which provides that "every subject shall have a right . . . to be fully heard in his defense by himself, or his counsel at his election." We have often noted that art. 12 provides "greater safeguards" than those provided by the Sixth Amendment.  See Commonwealth v. Hodge, 386 Mass. 165, 169 (1982).

be for naught if the accused were left to fend for him- or herself without the assistance of counsel to navigate and exercise his or her rights.  Gideon, 372 U.S. at 344-345.  See Cronic, supra at 653-654 ("Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have" [citation omitted]; counsel's assistance is "the means through which the other rights of the person on trial are secured").  The right to be heard, and even the right to a trial itself, "would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel."  Powell v. Alabama, 287 U.S. 45, 68-69 (1932).  See Cronic, supra at 653 n.8, quoting Powell, supra at 69 (accused person "requires the guiding hand of counsel at every step in the proceedings against him").[18]

"The very premise of our adversary system of criminal

---

[18] See United States v. Ash, 413 U.S. 300, 307 (1973) ("The function of counsel as a guide through complex legal technicalities long has been recognized by this Court"); Argersinger v. Hamlin, 407 U.S. 25, 31 (1972) ("The assistance of counsel is often a requisite to the very existence of a fair trial").  See also Commonwealth v. Leiva, 484 Mass. 766, 779 (2020) ("The right to counsel is critical to secure a defendant's right to a fair trial"); Abodeely v. County of Worcester, 352 Mass. 719, 723 (1967) ("The defence and trial of a criminal case today is a complicated and time-consuming business.  If we are to provide proper prosecution we must also provide appropriate defence under the Constitution as it has been interpreted").

justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free."[19]  Herring v. New York, 422 U.S. 853, 862 (1975).  "Unless the accused receives the effective assistance of counsel, 'a serious risk of injustice infects the [criminal] trial [process] itself.'"[20]  Cronic, 466 U.S. at 656, quoting Cuyler v. Sullivan, 446 U.S. 335, 343 (1980).  See United States v. Ash, 413 U.S. 300, 309 (1973), quoting Johnson v. Zerbst, 304 U.S. 458, 462-463 (1938) (right to counsel "minimize[s] the imbalance in the adversary system" and "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life of liberty, wherein the prosecution is presented by experienced and learned counsel").  In short, lawyers in criminal cases are "necessities, not luxuries."  Cronic, supra

---

[19] See Polk County v. Dodson, 454 U.S. 312, 318 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness"); Gardner v. Florida, 430 U.S. 349, 360 (1977) (plurality opinion) (affirming "belief that debate between adversaries is often essential to the truth-seeking function of trials").

[20] Relevant to the issues presented by this case, the right to effective assistance of counsel attaches well before trial and applies to the plea-bargaining process.  See Commonwealth v. Fernandes, 390 Mass. 714, 715 (1984) ("the plea is valid only when the defendant offers it . . . with the advice of competent counsel").  See also Lafler v. Cooper, 566 U.S. 156, 162 (2012) (right to counsel "extends to the plea-bargaining process").

at 653, quoting Gideon, 372 U.S. at 344.  See Gideon, supra (it is "an obvious truth" that "in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him").[21]

c.  Conflict of interest.  Given the primacy of counsel towards the realization of fair proceedings and a fair trial in our adversarial system, the constitutional guarantee entitles an accused person "to the untrammeled and unimpaired assistance of counsel free of any conflict of interest and unrestrained by commitments to others" and other causes (citation omitted). Commonwealth v. Hodge, 386 Mass. 165, 167 (1982).  See

---

[21] Because of the special value we place on the role of counsel in ensuring that the accused receives the benefits of the procedural and substantive safeguards that define our criminal justice system, the "constitutional guarantee of the assistance of counsel 'cannot be satisfied by mere formal appointment.'"  Lavallee, 442 Mass. at 235, quoting Avery v. Alabama, 308 U.S. 444, 446 (1940).  Instead, the constitutional right to counsel "entitle[s] a defendant to the effective assistance of counsel" (emphasis added).  Commonwealth v. Perkins, 450 Mass. 834, 850 (2008), quoting Commonwealth v. Martinez, 425 Mass. 382, 387 (1997).  See Strickland, 466 U.S. at 686, quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (right to counsel in criminal case is "right to the effective assistance of counsel").  In other words, "[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."  Lavallee, supra, quoting Strickland, supra at 685.  "To hold otherwise, 'could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel.'"  Cronic, 466 U.S. at 654, quoting Avery, supra.

Strickland, 466 U.S. at 688 ("Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty . . ."); Commonwealth v. Perkins, 450 Mass. 834, 850 (2008) (defendant must "be able to seek the advice and guidance of his attorney and . . . to rely on the undivided loyalty of his counsel to present the defense case with full force and zealousness" [citation omitted]).  See also Commonwealth v. Leiva, 484 Mass. 766, 779 (2020) ("That foundational proposition tying partisan advocacy to just results demands an accused's access to defense counsel who projects [t]he manifest appearance of a believer in the defendant's chosen plea of 'not guilty' . . . and delivers on the constitutional guaranty that a defendant need not stand alone against the State at any stage of the prosecution . . . where counsel's absence might derogate from the accused's right to a fair trial" [quotations and citations omitted]).

Accordingly, "under art. 12, if a defendant establishes an actual conflict of interest,[22] he is entitled to a new trial

---

[22] An actual conflict of interest arises where "the lawyer has a competing interest or responsibility that 'will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.'" Perkins, 450 Mass. at 851-852, quoting Comment [4] to Mass. R. Prof. C. 1.7, 426 Mass. 1330 (1998).  See Perkins, supra at 854 (counsel had actual conflict of interest where he agreed to wear wireless microphone during trial permitting documentary producer

without a further showing; he need not demonstrate that the conflict adversely affected his lawyer's performance[23] or resulted in actual prejudice," Commonwealth v. Mosher, 455 Mass. 811, 819 (2010); the standard from Commonwealth v. Saferian, 366 Mass. 89, 96 (1974),[24] which generally governs ineffective assistance of counsel claims, is inapt because, where counsel has an actual conflict of interest, the criminal trial process "loses its character as a confrontation between adversaries," Cronic, 466 U.S. at 656-657. See id., quoting United States ex rel. Williams v. Twomey, 510 F.2d 634, 640 (7th Cir.), cert. denied sub nom. Sielaff v. Williams, 423 U.S. 876 (1975) ("While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators"). See also Commonwealth v. Valentin, 470 Mass. 186, 196 (2014) (such

---

to record interactions, including privileged discussions, with defendant). See also Commonwealth v. Mosher, 455 Mass. 811, 820 n.19 (2010) ("Courts frequently consult standards laid out in applicable codes of professional ethics in considering whether an actual conflict exists"). The analysis whether an actual conflict arose is case-specific. See Commonwealth v. Cousin, 478 Mass. 608, 618 (2018), S.C., 484 Mass. 1042 (2020) ("We look to the attendant facts and circumstances surrounding the claimed actual conflict").

[23] By contrast, a defendant asserting an actual conflict of interest under the Sixth Amendment must show that the conflict "adversely affected" counsel's representation, although "prejudice" need not be shown. See Cuyler, 446 U.S. at 349-350.

[24] See note 15, supra.

errors "render the adversary process itself presumptively unreliable" such that "a criminal trial [is] fundamentally unfair or an unreliable vehicle for determining guilt or innocence" [quotations and citations omitted]); Commonwealth v. Goewey, 452 Mass. 399, 403 & n.3 (2008) ("relief can be granted without consideration of the merits of the defendant's underlying claims" in "limited class of cases" in which "the attorney abdicated his responsibility as the defendant's advocate").

A defense counsel makes countless choices, on and off the record, to protect a defendant's rights, and we rely on counsel's zealous advocacy, unimpeded by a conflict of interest, to ensure that no person is punished without fair proceedings; when a counsel's professional judgment is impaired by an actual conflict of interest, every action, and inaction, is called into question, and we cannot be confident that the outcome of the proceedings is fair and just. "[T]he effect of the conflict on the attorney's representation of the defendant is likely to be pervasive and unpredictable, while the difficulty of proving it may be substantial, 'particularly as to things that may have been left not said or not done by counsel.'" Mosher, 455 Mass. at 819, quoting Hodge, 386 Mass. at 170. In other words, "[i]t is impossible to know what different choices [a nonconflicted] counsel would have made, and then to quantify the impact of

those different choices on the outcome of the proceedings." Commonwealth v. Francis, 485 Mass. 86, 101 (2020), cert. denied, 141 S. Ct. 2762 (2021), quoting United States v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006). See Holloway v. Arkansas, 435 U.S. 475, 490-491 (1978) (conflict bears on what "the advocate finds himself compelled to refrain from doing" and so is "difficult to judge intelligently" because "to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible," requiring "unguided speculation").

In such circumstances, the conflict has "infect[ed] the defendant's representation to the point where 'prejudice is "inherent in the situation," such that no impartial observer could reasonably conclude that the attorney is able to serve the defendant with undivided loyalty.'" Commonwealth v. Cousin, 478 Mass. 608, 617 (2018), S.C., 484 Mass. 1042 (2020), quoting Mosher, 455 Mass. at 819-820. See Perkins, 450 Mass. at 850 (defendant "must be able to rely on the undivided loyalty of his counsel" [citation omitted]). See also Commonwealth v. Goldman, 395 Mass. 495, 508, cert. denied, 474 U.S. 906 (1985) ("Counsel's undivided loyalty to the client is crucial to the integrity of the entire adversary system"). Accordingly, "[w]here the defendant's counsel has labored under an actual . . . conflict, . . . we are unwilling to put a defendant 'to

the burden, perhaps insuperable, of probing the resolve and the possible mental conflict of counsel.'"[25,26] Mosher, supra at 819, quoting Commonwealth v. Cobb, 379 Mass. 456, 461 (1980), vacated sub nom. Massachusetts v. Hurley, 499 U.S. 809 (1980), appeal dismissed, 382 Mass. 690 (1981).  See Cronic, 466 U.S. at 658

---

[25] We have acknowledged an actual conflict of interest -- requiring no showing of prejudice -- in several circumstances. See Commonwealth v. Leslie, 376 Mass. 647, 653 & nn.11, 12, 13 (1978), cert. denied, 441 U.S. 910 (1979).  An actual conflict of interest exists when the attorney represents a codefendant with inconsistent or contradictory lines of defense.  See id. at 653 n.11, citing Commonwealth v. Bolduc, 375 Mass. 530, 540-543 (1978); Bolduc, supra at 540-541 ("The joint representation of clients with conflicting interests is a denial of Sixth Amendment rights").  Similarly, a conflict exists when the attorney maintains an attorney-client or direct and close personal relationship with a material prosecution witness.  See Leslie, supra at 653 n.13, citing Commonwealth v. Smith, 362 Mass. 782 (1973); Smith, supra at 784 ("An attorney representing both the defendant and a prosecution witness who is awaiting sentence may be hindered in the cross-examination of the witness").  And we have found that a conflict exists when the attorney has business or personal reasons for preferring a verdict unfavorable to the defendant.  See Leslie, supra at 653 n.12, citing United States v. Hurt, 543 F.2d 162 (D.C. Cir. 1976), and People v. Corona, 80 Cal. App. 3d 684, 719-727 (1978); Hurt, supra at 166 (appellate counsel argued rehearing while being sued by trial counsel for libel as to appellate argument); Corona, supra at 704, 719-720 (trial counsel's literary contract "called for . . . holding a lengthy and sensational trial at any price . . . to increase the financial potential of the acquired publication rights," and to forgo defenses of mental incompetence or legal insanity).

[26] Where no actual conflict exists, "an attorney's personal interests or obligations may still give rise to a 'potential' conflict," Mosher, 455 Mass. at 823, which requires reversal upon an additional showing of "material prejudice," Tate, 490 Mass. at 509, quoting Commonwealth v. Shraiar, 397 Mass. 16, 20 (1986).

(representation by conflicted counsel is "so likely to prejudice the accused that the cost of litigating [its] effect in a particular case is unjustified").

d. Racist, anti-Muslim animus. Doyle's animus against persons of the Muslim faith and his racism against Black persons, demonstrated by his social media posts (some of which were made at the court house while he was serving clients in his professional capacity), and manifest in his treatment of the defendant -- a Black, Muslim man -- during the representation, presented an actual conflict of interest in this case.[27] Doyle's social media postings "exhibited an intensity of bias that cannot be squared with []neutral decision making," Ellis v. Harrison, 947 F.3d 555, 563 (9th Cir. 2020) (Nguyen, J., concurring), as his other overt acts during the representation confirm. The defendant has shown that Doyle's biases infected his representation of the defendant. The record developed by the defendant shows more than a few stray social media postings, or comments made in the wake of highly charged emotional or shocking events, untethered to Doyle's conduct during the

---

[27] We reference these manifestations, as does the defendant, to demonstrate the defendant's showing of an actual conflict of interest. Because he has shown an actual conflict of interest, he need not show any prejudice, as discussed supra. We need not reach the hypothetical question, raised by the concurring justice, whether, in the absence of this evidence, a hypothetical defendant would have met his or her burden to show an actual conflict.

defendant's representation. See id. ("I do not suggest that every attorney who utters a racial epithet will be unable to adequately defend clients of a different race"). Instead, the defendant has shown a pattern of posts reflecting the intensity of Doyle's bias, coupled with a record that Doyle was unable to divorce his animus from his conduct as the defendant's counsel.

Although we cannot know with certainty whether Doyle's actions or inactions during the course of the representation were "motivated by anything other than [the defendant's] best interest," Hodge, 386 Mass. at 168, on the record before us, we cannot credibly assume that Doyle's representation was not affected by his virulent anti-Muslim and racist views, see Ellis, 947 F.3d at 562 (Nguyen, J., concurring) (when defense counsel makes "discretionary decisions in disregard of the client's interests on account of counsel's racism, the cumulative effect will be to impair the defense, but there is no way to pinpoint how it does so"). Importantly, we cannot know whether an attorney who did not share the animus Doyle harbored for persons of the Muslim faith and Black persons would have negotiated a better plea agreement. Nor can we know whether Doyle's other actions in the case were unaffected by his views regarding Black, Muslim individuals. Where, as the record shows was the case here, counsel harbors a deep-seated animus for

persons of the defendant's race[28] or religion, we cannot presume zealous advocacy; nor can we ask the defendant to prove how his counsel's bigotry might have affected the plea deal or otherwise impaired the representation, especially in view of the record that Doyle's bias reared its head in connection with his treatment of the defendant.[29]  There are "many invisible ways in which counsel's bias could have affected the [proceeding]," Ellis, supra at 563 (Nguyen, J., concurring), and the defendant need not engage in "a speculative inquiry into what might have occurred in an alternate universe" had he been appointed unbiased counsel, Francis, 485 Mass. at 101, quoting Gonzalez-Lopez, 548 U.S. at 150.

---

[28] Notably, Gideon and other seminal cases involving the right to counsel were decided during the heart of the civil rights era, as courts considered the protection of a broad range of rights, including the right to equal protection of the law. See Henning, Race, Paternalism, and the Right to Counsel, 54 Am. Crim. L. Rev. 649, 649 & n.3 (2017), citing Neuborne, The Gravitational Pull of Race on the Warren Court, 2010 Sup. Ct. Rev. 59, 86 ("Decided during the heart of the Civil Rights era, [Gideon was] implicitly -- although not explicitly -- concerned about the way [B]lack defendants were treated in the criminal and juvenile justice systems . . ."). See also Chin, Race and the Disappointing Right to Counsel, 122 Yale L.J. 2236, 2239 & n.5 (2013) (collecting scholarship concluding that "Gideon was a race case" despite Gideon himself being white).

[29] That the defendant here had a particularly thick skin and did not recognize Doyle's bigotry at the time is of no import. The standard for a conflict of interest is whether "no impartial observer could reasonably conclude that the attorney is able to serve the defendant with undivided loyalty." Mosher, 455 Mass. at 819-820.

We recognize that "[c]riminal defense attorneys are accustomed to representing individuals who commit reprehensible acts, and we assume that they can set aside any personal distaste for such clients during the representation."[30] Ellis, 947 F.3d at 563 (Nguyen, J., concurring). Here, however, Doyle did not leave his deep-seated bigotry at the court house door, despite his duty of loyalty to the defendant; to the contrary, consistent with his contemporaneous anti-Muslim, anti-Black social media postings and his court house "check ins," Doyle ordered the defendant to stop wearing his religious garb and refused to meet with the defendant, choosing instead to forgo the opportunity to discuss the merits of the criminal case, upon seeing that the defendant was wearing his kufi. Our confidence that the defendant was afforded a constitutionally fair process is necessarily undermined. See id. at 562 (Nguyen, J., concurring) ("A trial is fundamentally unfair if defense counsel harbors extreme and deep-rooted ill will toward the defendant on account of his race"). Given Doyle's treatment of the defendant, we conclude that the defendant has more than met his burden to establish that Doyle's representation of him was

---

[30] Doyle did not simply adhere to a different "worldview" or merely dislike the offenses the defendant was accused of committing. Racism and bigotry -- here, disdain for persons because of their race and religion -- are different in kind from disapproval of a person's actions or opinions.

impaired by an actual conflict of interest.  See Commonwealth v. Shraiar, 397 Mass. 16, 20 (1986) (defendant bears burden to establish actual conflict of interest).

3.  Conclusion.  The order denying the defendant's motion for a new trial is reversed.[31]  The defendant's convictions are vacated, the defendant is to be permitted to withdraw his guilty plea, and the case is remanded for a new trial.

So ordered.

---

[31] Because we hold that defense counsel had an actual conflict of interest mandating reversal, we need not address the defendant's alternative arguments that the appointment of Doyle violated his rights to equal protection and due process.

CYPHER, J. (concurring). The numerous, severe, and cruel racist and anti-Muslim social media posts and commentary by Attorney Richard Doyle recited by the court easily establish an actual conflict of interest that deprived the defendant of his constitutional right to effective assistance of counsel. I agree with the court that no impartial observer reasonably could conclude that counsel was able to serve the defendant with undivided loyalty. See Commonwealth v. Mosher, 455 Mass. 811, 819-820 (2010).

I write separately to emphasize that once an actual conflict has been established there is no need to prove that the actual conflict prejudiced the defendant. There is a clear line between actual and potential conflicts of interest and Attorney Doyle's behavior toward the defendant, which, while adding context to the discussion, is not necessary to determine whether there was an actual conflict. Cf. Ellis v. Harrison, 947 F.3d 555, 563 (9th Cir. 2020) (Nguyen, J., concurring) ("I do not suggest that every attorney who utters a racial epithet will be unable to adequately defend clients of a different race"). Where the defendant has demonstrated an actual conflict of interest, art. 12 of the Massachusetts Declaration of Rights requires neither a showing of prejudice nor a showing that the conflict adversely affected counsel's performance. Commonwealth v. Holliday, 450 Mass. 794, 806 (2008). See Commonwealth v.

Cousin, 478 Mass. 608, 617 (2018) (actual conflict requires no showing of prejudice by defendant because prejudice is inherent). Compare Commonwealth v. Watkins, 473 Mass. 222, 235 (2015) ("If a defendant establishes only a potential or tenuous conflict of interest, however, the conviction will not be set aside unless the defendant demonstrates that the conflict resulted in actual prejudice" [emphasis added]), with Mosher, 455 Mass. at 819 (where defendant "establishes an actual conflict of interest, he is entitled to a new trial without a further showing").

I also write separately because the nature of this conflict and its potential scope require that we recognize that not only the defendant is affected. Public confidence in the integrity of the criminal justice system is essential to its ability to function. See Georgia v. McCollum, 505 U.S. 42, 49 (1992). We must be aware of and concerned with the confidence of not just this defendant, and not just all Black and Muslim clients represented by Attorney Doyle, but rather all Black persons and members of the Muslim faith in our community, not simply those who have come into contact with the criminal justice system. See Commonwealth v. Goldman, 395 Mass. 495, 508 (1985) (defense counsel's undivided loyalty to client is crucial to integrity of entire adversarial system). In fact, all of the people of the Commonwealth can be affected by a loss of confidence in the

justice system in circumstances such as these when they come to light.  The court's decision today serves to encourage us all that the court system is able to respond in a manner that strengthens that confidence.